**PULMOSAN SAFETY EQUIPMENT CORPORATION, Appellant**

v.

**William LAMB, Appellee.**

No. 14–08–00279–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Dec. 9, 2008.

Michael A. Hatchell, Sarah B. Duncan, Susan A. Kidwell, Austin, Chrysta L. Castaneda, Dallas, TX, for appellants.

Tina M. Bradley, Beaumont, Brandon Paul Monk, Lance P. Bradley, Justin Gary Sanderson, Port Arthur, TX, for Appellee.

Panel consists of Chief Justice HEDGES and Justices GUZMAN and BROWN.

## OPINION

HEDGES, Chief Justice.

This interlocutory appeal contests the denial of a special appearance filed by appellant, Pulmosan Safety Equipment Co. ("Pulmosan"), in multi-district silica litigation. Pulmosan sought its dismissal from the litigation based on lack of personal jurisdiction. . Although declining to exercise general jurisdiction over Pulmosan, the trial court found that it could exercise specific jurisdiction. We affirm.

## I. Background

Appellee, William Lamb ("Lamb"), is a Texas resident who, over the course of his forty-year career, worked as a painter, insulator, and sandblaster at a paper mill in Evadale, Texas. Lamb claims that, as a result of his sandblasting duties in Texas, he contracted silicosis.

Pulmosan was a New York corporation operating from 1926 until its voluntary dissolution under the New York dissolution statute in 1986. It manufactured personal protective equipment for use in the abrasive-blasting industry. Lamb alleges that he used the Pulmosan H–30 series sandblast hood from the late 1960's to mid 1970's while working in Evadale, Texas. The H–30 hood protected the user's face, head, and shoulders from the ricochet of sandblasting. It was a non-airfed canvas hood, tannish brown in color, that draped over the user's head and shoulders. The number of H–30 hoods manufactured per year during the relevant time frame of the 1960's through 1975 is disputed. There is both evidence that production was in the "tens of thousands" and evidence that it was only one to two thousand per year. It is undisputed, however, that the hoods were manufactured by Pulmosan in New York.

*The method of sale and distribution of the H–30 hood in Texas.*

Pulmosan did not sell directly to end-users such as Lamb, or even to his employers. Instead, Pulmosan sold its products through distributors and what it called "original equipment manufacturers" ("OEMs"). Pulmosan described the distributors as "simply Pulmosan's wholesale customers—the 'accounts [Pulmosan was] selling to.'" OEMs were companies that

ultimately sold the equipment to employers and end-users, either under the Pulmosan label or under a private label. Pulmosan's corporate representative, Howard Weiss, characterized the distributors and OEMs as independent third-parties who were not controlled or employed by Pulmosan.

Pulmosan had several Texas distributors and OEMs selling its equipment in Texas during the time period Lamb claimed to have used the H–30 hoods.[1] One of the OEMs was a Houston-based company called Clemtex. Clemtex began selling H–30 hoods in Texas in 1955 and continued selling them until 1982. A Clemtex representative testified that Clemtex purchased 99.9 percent of the hoods directly from Pulmosan. Initially, the Pulmosan hoods Clemtex sold had a Pulmosan label, but eventually Clemtex furnished Pulmosan with Clemtex labels to be affixed to the hoods. Weiss referred to this practice as "private-labeling." There is evidence that Clemtex sold safety equipment to Lamb's employer during the relevant time period. There is no direct evidence, however, that Clemtex sold the H–30 hood that Lamb allegedly used.

Beginning in the late 1960's or early 1970s, Pulmosan placed an employee in the Dallas–Fort Worth area. The employee's job was to call on distributors and sell Pulmosan's products. The employee's territory encompassed three or four states, including Texas, Oklahoma, Louisiana, and possibly Arkansas. This employee later became a "manufacturer's representative," rather than a direct employee of Pulmosan, and Pulmosan continued to have a manufacturer's representative in Texas for the last fifteen or twenty years of its existence. The manufacturer's representatives sold Pulmosan's products on commission. During this time, Pulmosan had a Certificate of Authority on file with the State of Texas for the purpose of transacting business in the state.

Pulmosan also advertised its products throughout the United States in catalogs. Pulmosan normally sent the catalogs to anyone who was purchasing from them, "whether distributors, dealers, or OEM accounts." The 1964 catalog identified five warehouses across the United States for Pulmosan products, including one in Houston, Texas. The warehouse was owned and operated by a Pulmosan manufacturer's representative.

Instructions for product use were included in the product boxes and in the catalogs that Pulmosan sent to whoever bought equipment from Pulmosan. Pulmosan relied on the employers to make sure the employee was properly instructed and the equipment properly maintained.

### The evidence of use of the Pulmosan H–30 hood by Lamb.

During his deposition, Lamb testified that he used a grey hood that had a Clemtex label on it and a brown hood that had no label on it. He said he did not know who manufactured the brown hood. After his deposition, Lamb submitted an affidavit stating that he used a Pulmosan H–30 hood, and he attached to the affidavit Pulmosan catalog pictures identifying the hood. Pulmosan objected to this affidavit as conclusory and inconsistent with Lamb's prior deposition testimony that he did not know who manufactured the hood. The trial court overruled Pulmosan's objections. Although Pulmosan does not challenge the trial court's rulings on these objections, it challenges the legal sufficiency of the affidavit.

---

1. When asked whether he knew the type of plants, factories, or contractors who would be the end users for the products, Weiss said that almost every type of industry used them, but he did not know exactly to whom the distributors sold Pulmosan products.

Pulmosan also submitted an expert witness affidavit by Robert Sheriff, the president of a consulting company providing industrial safety and hygiene services. Sheriff stated that, during the 1960's and 1970's there were multiple manufacturers of the abrasive blasting hoods and that the hoods were very similar in description and appearance. "Most non-air fed hoods that were sold in the 1960's and 1970's were so similar in appearance that they are indistinguishable without a label identifying the manufacturer."

Lamb brought suit against numerous manufacturers and suppliers of sand and abrasive blasting equipment and protective gear. Lamb asserted claims for negligence, products liability (design and warning defect), and gross negligence. The suit was transferred to the silica multidistrict litigation pending in Judge Tracy Christopher's court.

Pulmosan filed a special appearance, plea to the jurisdiction, and answer. Before it heard Pulmosan's special appearance, the trial court abated the proceedings so that certain plaintiffs in the multidistrict litigation could proceed in a New York state court to obtain a ruling on the viability of their claims in light of Pulmosan's dissolution. The New York court ruled that the dissolution of Pulmosan was not effective as to those plaintiffs whose causes of action arose prior to the date of dissolution. *Ford v. Pulmosan Safety Equip. Corp.*, 13 Misc.3d 1242(A), 831 N.Y.S.2d 353, 2006 WL 3437670, at *7 (Sup.Ct. Queens Co.2007). The New York court specified that a viable claim against Pulmosan would "depend upon when these plaintiffs were first exposed to silica dust or, more accurately, upon the initial use of Pulmosan's defective safety equipment." *Id.*

The trial court in this case denied Pulmosan's special appearance based on a finding that it could exercise specific juris-

diction over Pulmosan. The trial court found that during the pertinent time of Lamb's use of the hood, Pulmosan intended to serve the Texas market. The court thus found specific jurisdiction under *Moki Mac River Expeditions v. Drugg.* 221 S.W.3d 569 (Tex.2007). The trial court also held that general jurisdiction did not exist. Under *PHC–Minden, L.P. v. Kimberly–Clark Corp.*, a trial court must assess contacts over a reasonable number of years. 235 S.W.3d 163 (Tex.2007). Up to the date of this lawsuit, Pulmosan had not done business, in Texas or elsewhere, since its dissolution in 1986. Lamb has not appealed the trial court's ruling on general jurisdiction. Rather, Pulmosan exclusively challenges the trial court's exercise of specific jurisdiction, claiming (1) Pulmosan lacked sufficient minimum contacts with Texas; and in any event there was no substantial connection between any of its contacts and the litigation; and (2) its dissolution deprived the trial court of jurisdiction.

## II. STANDARDS OF REVIEW

 Whether a trial court has personal jurisdiction over a defendant is a question of law this court reviews de novo. *Moki Mac*, 221 S.W.3d at 574; *Kelly v. General Interior Constr., Inc.*, 262 S.W.3d 79, 83 (Tex.App.-Houston [14th Dist.] 2008, pet. filed). The trial court, however, must often resolve questions of fact before deciding the jurisdictional question. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex.2002). In considering the denial of a special appearance, the court determines only the issue of jurisdiction, not liability. *Kelly*, 262 S.W.3d at 83. In determining jurisdictional pleas asserted by a defendant, we take as true the pleadings and allegations of the plaintiff and review the pleadings and allegations in the light most favorable to the plaintiff. *See Tex. Dept. of Transp. v. Ramirez*, 74

S.W.3d 864, 867 (Tex.2002) (holding that in considering jurisdictional motions, the reviewing court construes the pleadings in the plaintiff's favor); *Kelly,* 262 S.W.3d at 84 n. 3.

■ The plaintiff bears the initial burden of pleading sufficient allegations to invoke the jurisdiction of the Texas long-arm statute. *Am. Type Culture Collection v. Coleman,* 83 S.W.3d 801, 807 (Tex.2002). The nonresident defendant then has the burden of negating all bases of jurisdiction asserted in the plaintiff's allegations. *BMC Software,* 83 S.W.3d at 793.

### III. PERSONAL JURISDICTION

■ In its first issue, Pulmosan challenges the trial court's exercise of specific jurisdiction based on the claims asserted against it by Lamb. Texas courts may assert personal jurisdiction over a nonresident defendant if (1) the Texas long-arm statute authorizes the exercise of jurisdiction; and (2) the exercise of jurisdiction is consistent with federal and state constitutional due-process guarantees. *Moki Mac,* 221 S.W.3d at 574. The Texas long-arm statute provides in pertinent part that a non-resident does business in Texas if it "commits a tort in whole or in part in this state." Tex. Civ. Prac. & Rem.Code § 17.042(2). The Texas long-arm statute, however, reaches only "as far as the federal constitutional requirements of due process will allow." *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991).

■ Federal due-process limitations are satisfied if the nonresident defendant has established minimum contacts with the forum state and the exercise of jurisdiction comports with " 'traditional notions of fair play and substantial justice.' " *Moki Mac,* 221 S.W.3d at 575 (citing *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). A nonresident establishes minimum contacts with Texas by purposefully availing itself of the privileges and benefits inherent in conducting business in the forum state. *Id.; Control Solutions, Inc. v. Gharda Chemicals Ltd.,* 245 S.W.3d 550, 557 (Tex.App.-Houston [1st Dist.] 2007, no pet.). Sellers who create "continuing relationships and obligations with citizens of another state" are subject to jurisdiction based on their activities in the forum state. *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 785 (Tex.2005). In assessing minimum contacts, the quality and nature of the contacts, rather than their number, are determinative. *Control Solutions,* 245 S.W.3d at 557. Random, fortuitous, or attenuated acts, or unilateral acts of third-parties, are not sufficient. *Michiana,* 168 S.W.3d at 785.

■ A nonresident manufacturer need not have offices or employees in the forum state to meet the purposeful availment test. *Id.* Under the stream of commerce theory, a corporation who delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum state is subject to jurisdiction in suits arising from that activity. *See World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297–98, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). A plurality of the U.S. Supreme Court and the Texas Supreme Court have held, however, that the mere sale of a product to a resident is not sufficient-the allegations must also indicate an intent to serve the forum market. *Asahi Metal Ind. Co. v. Superior Court,* 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987); *Moki Mac,* 221 S.W.3d at 577. Examples of "additional conduct" that may evidence an intent to serve the forum market are: (1) designing the product for the market in the forum state; (2) advertising in the forum state; (3) establishing channels of regular communication with customers in

the forum state; and (4) marketing the product through a distributor who has agreed to serve as the sales agent in the forum state. *Asahi Metal,* 480 U.S. at 112, 107 S.Ct. 1026.

In the context of specific jurisdiction, intent to serve the Texas market is still not alone sufficient to confer jurisdiction over a nonresident defendant. To assert specific jurisdiction over a nonresident defendant, the allegations must also indicate that the defendant's liability arises from or relates to the defendant's minimum contacts with the forum state. *Moki Mac,* 221 S.W.3d at 576. A defendant's liability arises from or relates to its minimum contacts when there is a substantial connection between the defendant's contacts and the operative facts of the litigation. *Id.*

### A. *Pulmosan's Minimum Contacts with Texas.*

In determining whether, under the stream of commerce theory, the trial court properly found it could exercise specific jurisdiction over Pulmosan, we must examine the record for evidence that: (1) Pulmosan purposefully directed acts towards Texas indicating that it intended to serve the Texas market; and (2) Pulmosan's liability arises from or relates to its contacts with Texas. *See Moki Mac,* 221 S.W.3d at 577, 585.

#### 1. *Moki Mac*

Our inquiry into Pulmosan's purposeful direct acts toward Texas begins with an examination of *Moki Mac,* the supreme court's recent seminal pronouncement on specific jurisdiction. 221 S.W.3d 569. In *Moki Mac,* the plaintiffs' minor son died while on a river-rafting trip in Arizona with Moki Mac River Expeditions, a Utah-based company. *Id.* at 573. The court examined two sets of facts in determining whether the Utah company had purpose-

fully availed itself of the forum state. First, the court reviewed Moki Mac's marketing efforts in Texas and found that Moki Mac knowingly sold rafting trips to Texas residents and purposefully directed marketing efforts to Texas with the intent to solicit business from this state. *Id.* at 577. Moki Mac solicited Texas residents through mass and targeted direct-marketing email campaigns, sending brochures and trip information to people who had previously expressed interest in a trip, offering "free floats" to customers who coordinated a group of ten or more (at least two Texas residents earned the "free float") and paying a fee to a travel agency located in Houston, resulting in multiple trips involving Texas residents. *Id.* at 578.

Second, the defendant in *Moki Mac* established "channels of regular communication with its customers in Texas." *Id.* The defendant set up particular customers as *de facto* group leaders to plan, organize, and promote its trips and had a Texas resident serve as a group leader. *Id.* In fact, the trip the plaintiffs' son attended was planned by the Texas group leader— the plaintiffs were not directly solicited by Moki Mac. *Id.* Moki Mac kept the communication channels open by automatically sending information regarding new trips, schedules, and prices to those on its mailing list who had been a customer or who had expressed an interest in a trip within a three-year period. *Id.* The Court found that Moki Mac's advertisements directed toward Texas and its use of channels of regular communication with its customers showed an intent by Moki Mac to serve the Texas market, thus satisfying the purposeful availment prong. *Id.* at 578–79.

#### 2. *Evidence of Pulmosan's direct acts toward Texas.*

Like the defendant in *Moki Mac,* Pulmosan set up channels of regular

communication with Texas customers. It had distributors and OEMs in Texas that sold its products to Texas residents. During the relevant time period, Pulmosan had an employee in Texas whose duties included calling on the Texas distributors to sell Pulmosan's products. Pulmosan later had manufacturer's representatives whose territory included Texas and who also called on Texas distributors. The representatives were paid commissions from Pulmosan for the sale of its products. Placing a sales representative in the state to call on Texas distributors to sell Pulmosan's products shows an intent to serve the Texas market.[2] *See Asahi Metal*, 480 U.S. at 112, 107 S.Ct. 1026 (marketing product through distributor who has agreed to serve as the sales agent in the forum state showed purposeful availment). Moreover, the manufacturer's representatives are similar to the *de facto* group leaders the nonresident defendant used in *Moki Mac* and which evidenced an intent to serve the Texas market. *Moki Mac*, 221 S.W.3d at 578.

Also like the defendant in *Moki Mac*, Pulmosan regularly sent its catalogs to "anyone who was buying from it," including the Texas distributors and OEMs. One of the Pulmosan OEMs was Clemtex, a Texas-based company who sold hoods to Lamb's employer. In fact, Weiss testified that Pulmosan sold products to Clemtex "for a good many years." In its 1964 catalog, Pulmosan advertised several warehouses across the United States for its products, including one in Houston, Texas. Pulmosan had a certificate of authority to do business in Texas. This evidence is sufficient to show that, during the time Lamb claimed to have used Pulmosan

hoods, Pulmosan purposely directed its products toward Texas showing an intent to serve the Texas market. *See id.; Control Solutions*, 245 S.W.3d at 561.

Pulmosan argues that the evidence does not show purposeful availment because the distributors and OEMs were independent third parties, and *Michiana* tells us that shipping products in response to actions by third parties is not sufficient. Pulmosan's reliance on *Michiana* is misplaced. In that case, an R.V. manufacturer sent one product into Texas at the unilateral request of a Texas resident. *Michiana*, 168 S.W.3d at 787. Unlike *Michiana*, Pulmosan was not passively sitting in its shop in New York when one Texas resident called on the phone to purchase a product. Pulmosan sent products into Texas for "a good many years" and utilized a sales employee and manufacturer's representatives to call on and solicit sales from Texas residents. The fact that the distributors and OEMs were independent of Pulmosan does not shield it from jurisdiction. *See Moki Mac*, 221 S.W.3d at 578 (use of *de facto* group leaders, who were not agents or employees of the company, to plan, organize, and promote trips to Texas residents was evidence of purposeful availment); *Control Solutions*, 245 S.W.3d at 560–61 (use of independent Texas company to distribute products was evidence of intent to serve Texas market).

Pulmosan contends that the warehouse in Houston also cannot support jurisdiction because it was owned and operated by an independent manufacturer's representative. This argument, however, ignores the fact that Pulmosan chose to advertise the warehouse in its catalog; it was not the

**2.** Pulmosan argues that specific jurisdiction cannot rest solely on the shoulders of this one sales representative. There is evidence, however, of other acts by Pulmosan showing an intent to serve the Texas market. *See infra.*

In addition, courts must look to the quality and nature of the contacts rather than their number in determining purposeful availment. *See Control Solutions*, 245 S.W.3d at 557.

unilateral act of a third party. Pulmosan advertised the availability of its products in Texas, thus showing an intent to serve the Texas market.

In sum, the evidence shows that Pulmosan set up a chain of distribution of its products aimed at Texas, through the use of Texas distributors and OEMs, as well as a sales employee and manufacturer's representatives. This evidence satisfies the purposeful availment prong of the jurisdictional test.

3. *Evidence of a substantial connection between Pulmosan's contacts and the operative facts of the litigation.*

In *Moki Mac*, the Texas Supreme Court analyzed in depth the due process requirement that a nonresident defendant's contacts with the forum must "arise out of or relate to" the litigation in order to support specific jurisdiction. *Moki Mac*, 221 S.W.3d at 579–85. After reviewing various approaches applied by other jurisdictions, the Court determined that, under Texas law, there must be a substantial connection between the nonresident's contacts and the operative facts of the litigation. *Id.* at 585. To identify the operative facts of the litigation, the Court selected those facts that would be the focus of the trial. *Id.*

■■■ Pulmosan argues that there can be no substantial connection between its contacts and the operative facts of the litigation because there is no evidence that Lamb ever used a Pulmosan product. Alternatively, Pulmosan contends that the evidence of Lamb's use is factually insufficient. Pulmosan further argues that no substantial connection exists because the products were manufactured in New York, thus the case will involve only fact questions as to whether the products were defective when they left Pulmosan in New York. We disagree with both arguments.

First, whether Lamb *actually* used the Pulmosan hood is a merits-based question

that should not be resolved in a special appearance. *See Michiana*, 168 S.W.3d at 790–91 (focusing on whether defendant actually directed a tort towards Texas as a basis for jurisdiction improperly focuses on the merits rather than defendant's contacts with forum); *Kelly*, 262 S.W.3d at 83 (the court should not determine underlying liability in special appearance); *Weldon–Francke v. Fisher*, 237 S.W.3d 789, 792 (Tex.App.-Houston [14th Dist.] 2007, no pet.) (at special appearance stage, merits of claim are not at issue). Lamb does not have to prove actual use at the special appearance stage; we take as true his pleadings and allegations to decide this issue. *See Ramirez*, 74 S.W.3d at 867. The relevant point is that Lamb alleged he used the hood in Texas, thereby shifting the burden to Pulmosan to negate jurisdiction. *See BMC Software*, 83 S.W.3d at 793.

Second, even if it were not a merits-based question, there is legally and factually sufficient evidence to support jurisdiction. In determining a legal sufficiency challenge, this court reviews the evidence in the light most favorable to the challenged finding and indulges every reasonable inference that would support it. *See City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex.2005); *Weldon–Francke*, 237 S.W.3d at 792. We must credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *See Weldon–Francke*, 237 S.W.3d at 793. We must determine whether the evidence at trial would enable reasonable and fair-minded people to find the facts at issue. *Id.* The factfinder is the sole judge of the credibility of the witnesses and the weight of their testimony. *Id.* When reviewing a finding for factual sufficiency, we consider and weigh all of the evidence in a neutral light and conclude that the finding is not supported by sufficient evidence only if the

finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986) (per curiam).

Lamb stated in his deposition that he used two different hoods during the late 1960's to early 1970's while sandblasting at the Evadale paper mill. One he identified as a gray hood with a Clemtex label; the other hood he identified as a tannish brown hood that had no label. At his deposition, Lamb could not state who manufactured the tannish brown hood. After the deposition, however, Lamb submitted an affidavit with his response to Pulmosan's second amended special appearance that stated as follows:

> Prior to August 1, 1986, I wore the H–30 Series Sandblast Hoods manufactured by Pulmosan Safety Equipment Corporation (hereinafter referred to as "Pulmosan") while sandblasting.

> More specifically, while working for Mead Westvaco Corporation f/k/a Temple Inland Forest Products f/k/a Eastex, Inc. located in Texas (hereinafter referred to as "Westvaco"), a Evadale Company, from approximately 1969 until the mid 1970's, I wore the Pulmosan H–30 hood.

Lamb then stated in his affidavit that he had reviewed photographs of hoods in the Pulmosan catalogs and identified the picture of the H–30 hood from the catalog, attaching catalog photographs of the hood.

Pulmosan contends that this evidence is legally (and, alternatively, factually) insufficient because it is conclusory and incompetent. It points to the affidavit from its expert witness Robert Sheriff stating that there were multiple manufacturers making hoods similar to the Pulmosan H–30 and that the hoods were indistinguishable without a label identifying the manufacturer. Pulmosan also claims that the affidavit is incompetent because it conflicts with Lamb's prior deposition testimony and with Sheriff's uncontroverted affidavit.

Lamb's allegation of use was not conclusory but was based on an assertion of fact and the catalog pictures he attached to the affidavit. Lamb's affidavit did not directly contradict his deposition testimony. In his deposition, Lamb simply could not remember who manufactured the tannish brown hood and could not remember a label. After reviewing the catalog pictures, Lamb testified that he wore a Pulmosan hood.[3] While it is true that Pulmosan's expert Robert Sheriff stated that the hoods were virtually identical and indistinguishable without a label, he cannot conclusively prove that Lamb did not wear the H–30 hood. Even though Sheriff's affidavit may raise issues as to the credibility of Lamb's statement that he wore an H–30 hood, it simply raises a fact issue to be determined by the finder of fact during the determination of the merits of Lamb's claims. *See Weldon–Francke,* 237 S.W.3d at 793. Lamb alleged and submitted sworn testimony that he used a Pulmosan hood, sufficient to withstand a legal and factual sufficiency challenge in this special appearance.

Lamb has alleged claims for negligence, products liability, and gross negligence. His products liability claim involves allegations of defective manufacture and design and lack of adequate warning. Pulmosan answered by asserting, among other things, that Lamb's damages, if any, were caused by improper use of its products, acts and/or omissions of his employer, and the "manner, method, or condition under which [Lamb's] work was performed and over which Pulmosan had no control." In

---

3. Because Lamb did not clearly contradict his deposition testimony without explanation, Pulmosan's reliance on the "sham affidavit" theory is unavailing. *See Blan v. Ali,* 7 S.W.3d 741, 746 n. 3 (Tex.App.-Houston [14th Dist.] 1999, no pet.).

his deposition, Weiss explained that a determination of whether the worker properly selected and used the H–30 hood would require information regarding the work conditions and the worksite, including ventilation conditions and concentration levels of abrasive material. While it is true that the focus of the trial will include issues relating to a product that was manufactured in New York and the conditions when the product left New York, it will also include acts and omissions of persons in Texas, the conditions of the worksite in Texas, and the use of the marketing materials that were sent with the catalogs and product boxes to Texas.

This case is similar to *Control Solutions*, a case involving an Indian company who manufactured chemicals in India and then shipped them to Texas with instructions on how to melt the chemicals upon arrival. 245 S.W.3d at 556. The plaintiff brought suit because, upon melting, the chemicals caught fire and caused damage to two buildings. *Id.* The court held that a substantial connection existed between the minimum contacts and the operative facts of the litigation, noting that the operative facts "concern the fire and the contamination of the drums of Chlorpyrifos, and the related questions of (a) whether this contamination rendered the Chlorpyrifos defective, (b) whether the delivery of the contaminated drums breached an express warranty, the implied warranty of merchantability, or both, and (c) whether Gharda Chemicals exercised reasonable care in the manufacture and packaging of the Chlorpyrifos." *Id.* at 562.

The operative facts in *Control Solutions* included actions that occurred outside of Texas (the manufacture of the chemicals), as well as use and subsequent damage inside of Texas (melting of the drums and the fire). Likewise, the operative facts in this case involve actions that occurred outside of Texas (the manufacture of the

hoods in New York) and use and subsequent damage inside of Texas (injury caused when sandblasting and wearing the hoods in Texas). As in *Control Solutions,* the substantial connection element is satisfied.

Pulmosan challenges any finding that a substantial connection exists by claiming that it would be based on an impermissible "stacking of fortuities-such as: Pulmosan *might* have shipped an H–30 hood to a Texas distributor, who *might* have been Clemtex, who *might* have sold the hood to Lamb's employer, who *might* have supplied the hood to Lamb, who *might* have used the hood while sandblasting in the late 1960's." (emphasis in original). The fallacy of this argument, however, is that there is evidence in the record to support each of these alleged fortuities: Pulmosan did ship hoods to Texas distributors, including Clemtex (to whom it sold "a good many years"), Clemtex did sell to Lamb's employer (99.9 percent of the hoods Clemtex sold were bought directly from Pulmosan), Lamb's employer did supply a hood to Lamb, and Lamb did use a hood while sandblasting in the late 1960's. Pulmosan believes that Lamb likely did not use a Pulmosan hood, but that is for the factfinder to determine on the merits after reviewing all of the evidence.

## IV. FAIR PLAY AND SUBSTANTIAL JUSTICE

Once minimum contacts sufficient to support jurisdiction are established, these contacts may be considered, in light of other factors, to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice. *Kelly,* 262 S.W.3d at 87 (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). The other relevant factors are: (1) the burden on the nonresident defendant; (2) the forum state's in-

terest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering substantive social policies. *Id.*

Because the minimum contacts analysis encompasses so many fairness factors, it has become less likely that the exercise of jurisdiction will offend traditional notions of fair play and substantial justice. *See Schlobohm v. Schapiro,* 784 S.W.2d 355, 357–58 (Tex.1990). "The question is whether, despite the existence of minimum contacts, there is any reason why our assertion of jurisdiction in this case would offend traditional notions of fair play and substantial justice." *Id.* at 359. Only in rare cases will the exercise of jurisdiction fail the fair-play analysis when the defendant has purposefully established minimum contacts with the state and can thus expect to be haled into a Texas court. *Guardian Royal,* 815 S.W.2d at 231.

The only arguments made by Pulmosan with regard to the fair-play analysis are that Texas does not have a strong interest in adjudicating a dispute involving a dissolved New York corporation and it would be just as convenient for the plaintiffs to litigate in New York. We disagree. Texas has a strong interest in adjudicating disputes involving Texas citizens such as Lamb. *See D.H. Blair Inv. Banking Corp. v. Reardon,* 97 S.W.3d 269, 278 (Tex.App.-Houston [14th Dist.] 2002, pet. dism'd w.o.j.) ("The state of Texas has an obvious interest in providing a forum for resolving disputes involving its citizens, particularly those disputes in which the defendant allegedly committed a tort in whole or in part in Texas."). Lamb has lived and worked in Texas for many years and it would be more convenient for him to litigate in Texas. Moreover, there is no addi-

tional convenience to litigating in New York. The New York court even noted that, given the ongoing multi-district litigation, Texas is the more appropriate forum for evidentiary hearings regarding plaintiffs' exposure to Pulmosan's product. *Ford,* 2006 WL 3437670, at *9.

Lamb also points out that Texas has created a depository for related litigation in the MDL, thus easing the burden on Pulmosan. Nothing in the record indicates that litigation in a Texas court would be excessively burdensome or inconvenient to Pulmosan. *See Schlobohm,* 784 S.W.2d at 359. In fact, Pulmosan has been litigating silica claims in Texas for many years. The exercise of specific jurisdiction over Pulmosan comports with traditional notions of fair play and substantial justice.

We overrule Pulmosan's first issue arguing that Texas cannot exercise specific jurisdiction over the claims asserted by Lamb.

### V. PULMOSAN'S DISSOLUTION ARGUMENT

In its second issue Pulmosan asserts that the trial court could not exercise personal jurisdiction over it because of its voluntary dissolution in 1986 under the New York dissolution statute. According to Pulmosan, the jurisdictional inquiry depends, as a threshold matter, upon whether the claims survived its dissolution. *See Gomez v. Pasadena Health Care Mgmt., Inc.,* 246 S.W.3d 306, 316 (Tex.App.-Houston [14th Dist.] 2008, no pet.) (reviewing Texas dissolution statute and holding that failure to comply with survival provision means there is no entity to be sued). Whether the claims survived Pulmosan's dissolution is governed by the provisions of the New York dissolution statute. *See Miller Mgmt. Co. v. State,* 140 Tex. 370, 167 S.W.2d 728, 730 (1943).

Under the New York dissolution statute, a corporation's dissolution does not "affect

remedies against the corporation for any 'claim existing or any liability incurred before such dissolution.'" *Ford*, 2006 WL 3437670, at *5 (citing N.Y. Bus. Corp. Law § 1006(b) (McKinney 2003)). In ruling on the Texas MDL plaintiffs' special action in New York, the New York state court thus held:

> Accordingly, as concerns the case at the bar, the viability of the petitioner's claims against Pulmosan, and necessarily those of the other plaintiffs in the Texas MDL, will depend upon when these plaintiffs were first exposed to silica dust or, more accurately, upon the initial use of Pulmosan's defective safety equipment.

*Id.* at *7.[4]

Pulmosan argues that there was no evidence that Lamb used its product prior to Pulmosan's dissolution and thus under the New York court's decision, Pulmosan's voluntary dissolution cut off Lamb's claim. We disagree. First, we do not read the New York court decision to require, at this stage of the litigation, proof of Lamb's actual use of a Pulmosan product. As discussed above, actual use is a merits-based question that should not be resolved in a special appearance. *See supra* at 839–40. Second, Lamb presented legally and factually sufficient allegations and evidence of use prior to Pulmosan's dissolution in 1986, sufficient to withstand Pulmosan's special appearance. *See supra* at 839–41. Pulmosan is, of course, free to seek a determination on actual use at the merits stage of the litigation. We overrule Pulmosan's second issue.

## VI. CONCLUSION

We conclude that the pleadings and the jurisdictional evidence establish the trial court's specific jurisdiction over Pulmosan.

4. Pulmosan appealed the New York trial court's decision and the appellate court affirmed. *See Ford v. Pulmosan Safety Equip.*

We affirm the trial court's order denying Pulmosan's special appearance.

*Corp.*, 52 A.D.3d 710, 862 N.Y.S.2d 56 (N.Y.App.Div. June 17, 2008).