Affirmed and Opinion filed August 25, 2011.

 

 

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-10-01017-CV

___________________

 

Smart Call, L.L.C. D/B/A Beyond Wireless,
Appellant

 

V.

 

Genio Mobile, Appellee



 



 

On
Appeal from the 61st District Court

Harris County,
Texas



Trial Court Cause No. 2010-25504

 



 

 

OPINION

            This is an interlocutory appeal from the trial court’s
order denying the special appearance of Smart Call, L.L.C..  Smart Call
contends the trial court erred because it does not have the minimum contacts to
support personal jurisdiction.  We affirm.    








I

Smart Call is a Delaware limited-liability corporation
with Ohio as its principal place of business.  Genio is a Texas corporation
with its principal place of business in Sugar Land.  Both companies are
involved at different levels in the delivery of cell-phone service.  Smart Call
is a “mobile network operator” that purchases access to a national cell-phone
network and then resells that access to companies that directly provide
cell-phone service.  Genio is a “mobile virtual network operator” that directly
provides cell-phone service to its customers but does not maintain a physical
cell-phone network and therefore must purchase access through a mobile-network
operator.  

Genio sought to introduce prepaid cell-phone service
in the Houston and Dallas markets.  In 2008, Genio’s president, Ricardo Flores,
contacted Smart Call in Ohio on the recommendation of a friend, Humberto Galvan. 
To launch its cell-phone service, Genio needed (1) access to a national
cell-phone network, and (2) SIM cards for its phones programmed with phone
numbers linked to the network.  Smart Call represented it could provide both. 
Negotiations ensued between the two companies over phone, e-mail, and video
conferences, and Flores personally traveled twice to Ohio to meet with Smart
Call.  

In December 2008, a document entitled “GSM MVNO Service
Agreement” was circulated via email among Flores, Galvan, and Richard
Stupansky, Smart Call’s chief operating officer.  Never signed, the service
agreement contained terms referring to Smart Call and an unnamed
mobile-virtual-network operator; it does not name Genio expressly.[1]  The accompanying
emails reflect a portion of what appears to be a protracted exchange concerning
the terms of the agreement.  The last e-mail in the record is from Galvan to
Stupansky, in which Galvan apparently forwards the service agreement to
Stupansky and suggests postponing a previously scheduled conference so
Stupansky would “have time to review the mails below.”[2]  Galvan writes
that Stupansky should “not worry about their requests, again most of them will
not apply or change what we have already negotiated.”  There is no further
indication that the parties adopted the service agreement, and Flores denied in
deposition that Genio’s breach-of-contract suit was based on the unsigned
service agreement.  

The record also contains a series of three Smart Call
invoices sent to Genio at its Sugar Land office.  Together, the invoices
reflect the sale of 10,000 SIM cards with related programming and startup
costs, totaling $112,000.[3] 
The invoices reflect they are to be billed and the products shipped to Genio’s
Sugar Land office.  Genio alleges it wired $84,450 from its Texas bank to Smart
Call in partial payment of the invoices, after which Genio alleges “significant
performance delays” on Smart Call’s part.  Genio’s CEO and vice president,
Octavio Hinojosa, who joined the company in February 2009, testified that between
February and June 2009, Genio and Smart Call representatives were in “constant
communication,” exchanging between 100 and 120 emails, four to five phone calls
a week, and video conferencing “very constantly.”  Hinojosa also traveled to
Ohio to meet personally with Smart Call.    

Hinojosa testified that although Genio was otherwise ready
to begin offering its pre-paid cell-phone service in February or March of 2009,
it was unable to do so because it was waiting on Smart Call to provide the
invoiced programmed SIM cards.  Hinojosa testified that a SIM card must be
linked to a ZIP code, which in turn generates an area code for a phone number,
and that Genio requested Smart Call program its SIM cards with Texas area
codes.  Hinojosa further testified Smart Call knew Genio would service Texas
markets exclusively, and estimated between ten and twenty separate
communications between Genio and Smart Call regarding customization of the SIM cards
for Texas cell-phone users.  

In June 2009, Smart Call’s CEO, Yehi Ben Soshan,
traveled to Houston to meet with Flores and Hinojosa.  The three discussed the
delays on the project and, according to Flores and Hinojosa, Soshan ultimately
told Flores and Hinojosa that Smart Call would not be able to provide the
agreed-upon services.  Smart Call directed Genio to another mobile-network
provider and supplied Genio with 2,000 SIM cards, programmed with Texas area
codes, which Hinojosa testified was a show of “good will.”  Genio then sued
Smart Call for breach of contract, quantum meruit, promissory estoppel, and assumpsit.
Genio asserts actual damages of $77,450, which reflects the $84,450 payment
Genio made to Small Call less the $7,000 value of the SIM cards Smart Call
provided after Soshan’s June 2009 visit to Texas.  

II

A

Whether a trial court has personal jurisdiction over
a defendant is a question of law we review de novo.  Moki Mac River
Expeditions v. Drugg, 221 S.W.3d 569, 574 (Tex. 2007); BMC Software
Belgium, N.V. v. Marchand, 83 S.W.3d 789, 794 (Tex. 2002).  When, as here,
the trial court issues no findings of fact and conclusions of law, all facts
necessary to support the judgment and supported by the evidence are implied.  BMC
Software, 83 S.W.3d at 795.  

The plaintiff has the initial burden of pleading
sufficient allegations to bring the nonresident defendant within the provisions
of the Texas long-arm statute.  BMC Software, 83 S.W.3d at 793; Brocail
v. Anderson, 132 S.W.3d 552, 556 (Tex. App.—Houston [14th Dist.] 2004, pet.
denied).  A defendant challenging a Texas court’s personal jurisdiction over it
must negate all jurisdictional bases alleged.  BMC Software, 83 S.W.3d
at 793; Nat’l Indus. Sand Ass’n v. Gibson, 897 S.W.2d 769, 772 (Tex.
1995).

Texas courts may exercise jurisdiction over a
nonresident if the Texas long-arm statute authorizes the exercise of personal
jurisdiction and the exercise of jurisdiction is consistent with federal and
state constitutional guarantees of due process.  Moki Mac, 221
S.W.3d at 574); BMC Software, 83 S.W.3d at 795.  The Texas long-arm
statute authorizes Texas courts to exercise jurisdiction over a nonresident
defendant who “does business” in the state.  Tex. Civ. Prac. & Rem. Code §
17.042.  The Texas Supreme Court has interpreted the broad language of the
Texas long-arm statute to extend Texas courts’ personal jurisdiction “‘as far
as the federal constitutional requirements of due process will permit.’”  BMC
Software, 83 S.W.3d at 795 (quoting U–Anchor Adver., Inc. v. Burt,
553 S.W.2d 760, 762 (Tex. 1977).

Personal jurisdiction over a nonresident defendant is
constitutional when two conditions are met: (1) the defendant has established
minimum contacts with the forum state; and (2) the exercise of jurisdiction
comports with traditional notions of fair play and substantial justice.  Int’l
Shoe Co. v. Washington, 326 U.S. 310, 316 (1945); BMC Software, 83
S.W.3d at 795.  Minimum contacts are sufficient for personal jurisdiction when
the nonresident defendant purposefully avails itself of the privilege of
conducting activities within the forum state, thus invoking the benefits and
protections of its laws.  Int’l Shoe, 326 U.S. at 319; Michiana Easy
Livin’ Country, Inc. v. Holten, 168 S.W.3d 777, 784 (Tex. 2005).  In
determining whether a defendant has purposefully availed itself of the forum, courts
should remember that only the defendant’s contacts with the forum matter, the
acts relied on must be purposeful rather than merely fortuitous, and the
defendant must seek some benefit, advantage, or profit by availing itself of
the forum.  Michiana, 168 S.W.3d at 785.  

Texas courts may exercise two types of jurisdiction
based on a nonresident’s contacts with the state.  If the defendant has made
continuous and systematic contacts with the forum, general jurisdiction is
established whether or not the defendant’s alleged liability arises from those
contacts.  Moki Mac, 221 S.W.3d at 575; BMC Software, 83 S.W.3d
at 796.  In contrast, when specific jurisdiction is alleged, we focus the
minimum-contacts analysis on the relationship among the defendant, the forum,
and the litigation.  Moki Mac, 221 S.W.3d at 575–76.  Specific
jurisdiction is established if the defendant’s alleged liability arises out of
or is related to an activity conducted within the forum.  Id. at 576. 
For a nonresident defendant’s forum contacts to support an exercise of specific
jurisdiction, there must be a substantial connection between those contacts and
the operative facts of the litigation.  Id. at 580, 585.  To identify
the operative facts of the litigation, we select those facts that would be the
focus of the trial.  See id.; Pulmosan Safety Equip. Corp. v. Lamb,
273 S.W.3d 829, 839 (Tex. App.—Houston [14th Dist.] 2008, pet. denied).  

B

Genio contends that Smart Call engaged in acts amounting
to “doing business” in Texas by contracting with a Texas resident and engaging
in other purposeful contacts.  See Tex. Civ. Prac. & Rem. Code §
17.042.  Genio also maintains Smart Call has constitutionally sufficient
minimum contacts to support specific jurisdiction, and that the assumption of
jurisdiction would not offend traditional notions of fair play and substantial
justice.  Specifically, Genio contends the following minimum contacts support
personal jurisdiction over Smart Call: (1) the three invoices sent to Genio’s
Sugar Land office, each of which Genio contends was a separate contract Smart
Call breached; (2) Soshan’s June 2009 meeting with Flores and Hinojosa in Texas,
at which he informed them that Smart Call would not be able to perform as
agreed; (3) Smart Call’s knowledge that the SIM cards provided under the
agreement would be used by Texas customers and therefore must be programmed
with Texas area codes; (4) 2,000 SIM cards programmed with Texas area codes
were actually delivered to Genio; (5) Smart Call’s promise to provide access to
a national cell-phone network, which would necessitate use of Texas cell-phone
towers; (6) acceptance of partial payment of the invoices through wire transfer
from Genio’s Texas bank; and (7) extensive communication between the parties,
including phone, e-mail, and video conferencing.  

Smart Call, on the other hand, maintains it lacks
sufficient minimum contacts with Texas because (1) Genio contacted Smart Call
in Ohio; (2) Smart Call had not done any business in Texas before contracting
with Genio; (3) the contract between Genio and Smart Call was to be performed
in Ohio and Montana; and (4) Smart Call has no physical presence or employees
in Texas and has never marketed its products and services in Texas.  Smart Call
argues that merely contracting with a Texas company does not constitute
purposeful availment for jurisdictional purposes.  See, e.g., IRA
Res., Inc. v. Griego, 221 S.W.3d 592, 597–98 (Tex. 2007) (per curiam); Alenia
Spazio, S.p.A. v. Reid, 130 S.W.3d 201, 213 (Tex. App.—Houston [14th Dist.]
2003, pet. denied); Shell Compania Argentina de Petroleo, S.A. v. Reef
Exploration, Inc. 84 S.W.3d 830, 838 (Tex. App.—Houston [1st Dist.] 2002,
pet. denied).    

The parties agree they contracted between themselves
but do not agree which documents evince their agreement.  Smart Call argues the
unsigned service agreement, which requires any disputes to be submitted to
arbitration in Ohio under Ohio law, is the contract.  Conceding the document is
unsigned and does not name Genio as a party, Smart Call argues the accompanying
e-mails constitute written confirmation of its terms sufficient to make the
contract enforceable.[4] 
See Tex. Bus. & Com. Code § 2.201(b) (providing an unsigned contract
for goods may be enforceable upon written confirmation of the contract’s
terms).  Smart Call further argues the forum-selection clause is evidence of
Smart Call’s intent to avoid availing itself of the benefits and protections of
Texas law.  See Michiana, 168 S.W.3d at 792 (citing Burger King,
471 U.S. at 482) (holding choice-of-law provisions should be considered when determining
purposeful availment).  Further, because all of its negotiations with Genio and
the three invoices are subsumed by the service agreement, Smart Call argues its
dealings with a Texas resident are confined to an isolated contract calling for
performance in Ohio and Montana and which a Texas resident initiated.[5]  

Genio concedes the service agreement is “useful to
indicate [the parties’] intended course of dealing,” but maintains none of the
e-mails constitute written confirmation of the contract under section 2.201(b)
of the Business and Commerce Code.  Genio instead bases its breach-of-contract
claim on the three invoices, each of which, Genio argues, is an individual
contract.  Accordingly, Genio characterizes its claim as a breach of several
contracts rather than of one, isolated contract.  

We will not delve in to the merits of the underlying
case by determining whether the unsigned service agreement controls the dispute
in this case.  Our inquiry is limited to the evidence of jurisdictional facts
sufficient to support the trial court's special-appearance ruling.  See Michiana,
168 S.W.3d at 790-91; Info. Svcs. Grp., Inc. v. Rawlinson, 302 S.W.3d
392, 407 (Tex. App.—Houston [14th Dist.] 2009, pet. denied); Pulmosan Safety
Equip., 273 S.W.3d at 839.  Whether the service agreement is binding on the
parties and requires dismissal of this claim in light of its forum-selection
clause is a determination best left to the trial court after we have determined
the personal-jurisdiction issue.

1

For the reasons discussed below, we conclude Smart
Call has sufficient minimum contacts to support specific jurisdiction over it
in this case.[6] 
The purposeful availment requirement ensures that a defendant will not be haled
into a jurisdiction solely as a result of the unilateral activity of another
party or third person.  Michiana, 168 S.W.3d at 785.  Accordingly, it is
well-settled by the supreme courts both of the United States and Texas that
there can be no purposeful availment in cases involving isolated sales
solicited by consumers who proposed to use the product in a state where the defendant
does not conduct business.  Burger King, 471 U.S. at 475 n.17; World-Wide
Volkswagen Corp. v. Woodson, 444 U.S. 286, 295 (1980); Michiana, 168
S.W.3d at 786.  Smart Call attempts to place this case within this framework by
characterizing it as “a single Texas agreement, with a single Texas resident,”
initiated by Genio and to be performed in Ohio and Montana.  

But even if we agree the relationship between the
parties in this case is governed by a single contract, it does not necessarily
follow that a single contract cannot contain contacts sufficient to establish
purposeful availment of a foreign jurisdiction.  See Michiana, 168
S.W.3d at 787.  Our supreme court has acknowledged that a single contract could
not automatically confer jurisdiction “when it involves a single contact taking
place outside the forum state,” but further recognized that “[i]t is true that
in some circumstances a single contract may meet the
purposeful-availment standard.”  Id.  The court further noted the United
States Supreme Court’s holdings that a long-term franchise agreement “may
establish minimum contacts because, though it stems from a single contract, it
involves many contacts over a long period of time,” and that a life-insurance
policy “may stem from a single contract, but necessarily involves a series of
contacts until death does the parties part.”  Id. (citing Burger King,
471 U.S. at 480; McGee v. Int’l Life Ins. Co., 355 U.S. 220, 223 (1957)). 


In Michiana, the supreme court concluded that
a single product sale stemming from a single phone call initiated by a Texas
resident to a nonresident defendant was not a purposeful contact sufficient to satisfy
the due-process minimum-contacts test.  Id. at 781, 785–86.  In another
case, the court similarly concluded Texas courts had no jurisdiction over a
French manufacturer that made no effort to market its winepress equipment in
Texas, had only one other Texas sale, and did not initiate the sale at issue to
a Texas buyer.  CMMC v. Salinas, 929 S.W.2d 435, 439) (Tex. 1996).  This
case is similar to Michiana and CMMC in that in each case the
Texas resident initiated the sale.  But this case differs in a critical respect—it
is not an isolated sale of goods, but a long-term service agreement.  

Smart Call indeed sold goods to Genio—10,000 SIM cards. 
But that was just part of the transaction.  In the language of the unsigned
service agreement, Genio was to “operate as a reseller of [Smart Call’s]
Services and Products.”  The SIM cards were merely a means to effectuate the
larger purpose of the agreement:  to provide Genio and its Texas customers with
ongoing access to a national cell-phone network.  Under this arrangement, Smart
Call agreed with a Texas company to specially program SIM cards with Texas area
codes for use by Texas residents.  Every time a Genio customer placed or
received a call, Smart Call would provide the airtime.  Necessarily, therefore,
Smart Call’s contacts with Texas would be continuous, as it would daily provide
cell-phone-network access to Texans throughout the life of its agreement with
Genio.

The transaction Smart Call and Genio contemplated in
this case is very different from the random and fortuitous encounters that led
the Indiana dealership in Michiana to sell a recreational vehicle or the
French manufacturer in CMMC to sell a winepress.  Here, the parties
contemplated a long-term agreement, the goal of which was to provide cell-phone
service on an ongoing basis exclusively to Texans.  

These facts bear more similarity to the United States
Supreme Court’s Burger King than our supreme court’s line of single-sale
cases.  Burger King sued Rudzewicz, a franchisee, in Florida, the location of
its headquarters, even though Rudzewicz’s franchise was in Michigan.  Burger
King, 471 U.S. at 466.  Rudzewicz argued that he was not subject to
personal jurisdiction in Florida because his restaurant was located in Michigan
and he had never even visited Florida.  Id. at 469, 479.  The court
concluded that “this franchise dispute grew directly out of “‘a contract which
had a substantial connection with that State.’” Id. at 479 (quoting McGee,
355 U.S. at 223).  In reaching its conclusion, the court noted that Rudzewicz deliberately
“‘reached out beyond’ Michigan and negotiated with a Florida corporation for
the purchase of a long-term franchise and the manifold benefits that would
derive from affiliation with a nationwide organization.”  Id. at 479–80.
 The Court also explained that in light of Rudzewicz’s “voluntary acceptance of
the long-term and exacting regulation of his business” from Burger King’s Miami
headquarters, the quality and nature of his relationship to the company in
Florida could in no sense be viewed as random, fortuitous, and attenuated.  Id.
at 480.  Further, Rudzewicz’s default on the required payments to the
Florida home office and his illegal use of Burger King’s trademarks “caused
foreseeable injuries to the corporation in Florida” and therefore “it was, at
the very least, presumptively reasonable for Rudzewicz to be called to account
there for such injuries.”  Id.

Smart Call argues this case is unlike Burger King because
the agreement here “does not create the kind of interdependent relationship
represented by a franchise agreement.”  Granted, there is no franchise
agreement under these facts.  Questions of personal jurisdiction are always
highly fact-intensive, and it is rare that two cases are completely analogous. 
The contracts in this case and in Burger King are different documents
addressing different products and services in different industries.  But the
rationale behind Burger King is not limited to disputes surrounding
franchise agreements.  Rather, Burger King stands for the principle that
a single contract can produce “continuing and wide-reaching contacts” that
cross the purposeful-availment threshold even though a single, isolated
contract for a sale of goods in a foreign jurisdiction remains too random,
fortuitous, or attenuated to confer jurisdiction.  See Burger King, 471
U.S. at 480; cf. Michiana, 168 S.W.3d at 786–88.    

The Burger King court, acknowledging that a
contract with an out-of-state party does not automatically establish sufficient
minimum contacts, also emphasized the need for a “‘highly realistic’ approach
that recognizes that a ‘contract’ is ‘ordinarily but an intermediate step
serving to tie up prior business negotiations with future consequences which
themselves are the real object of the business transaction.’”  Burger King,
471 U.S. at 479 (quoting Hoopeston Canning Co. v. Cullen, 318 U.S. 313,
316–17 (1943)).  It is these factors—prior negotiations and contemplated future
consequences, along with the terms of the contract and the parties’ actual
course of dealing—that must be evaluated in determining whether the defendant
purposefully established minimum contacts within the forum.  Id.  The
business designation of the parties’ relationship to each other therefore is
but one consideration in a determination of whether the parties have the kind
of “interdependent relationship” that constitutes a purposeful availment of the
forum by the out-of-state defendant.  

Smart Call negotiated with Genio fully knowing that
Genio served only Texas customers and took the additional step of customizing
its products for the Texas market—a fact inconsistent with an argument that
Smart Call’s Texas contacts were random or fortuitous.  As a result, this
dispute grew directly out of “a contract which had a substantial connection”
with the forum state, in this case Texas.  Burger King. 471 U.S. at 479
(quoting McGee, 355 U.S. at 223).  The service agreement’s contemplated
terms, and in particular the obligations placed on Genio, sets the stage for a long-term
agreement through which Smart Call, a mobile-network operator, would reap “manifold
benefits” from Genio, a mobile-virtual-network operator that could sell Smart
Call’s airtime to its Texas customer base.  See id. at 479–80.  Just as
the court concluded it would be foreseeable that a breach of the Burger King
franchise agreement would cause injuries to Burger King in Florida, we conclude
that a breach of this agreement would cause foreseeable injuries to Genio in
Texas.  Genio’s entire customer base was to exist in Texas; Smart Call’s
failure to deliver network access specifically to Texas cell-phone users would
immediately result in Genio’s inability to provide its customers with its
service.[7] 
See id.  

2

Additionally, Smart Call’s CEO Yehi Ben Soshan’s 2009
visit to Texas to meet with Flores and Hinojosa indicates further purposeful
availment of Texas.  It was at this meeting that Smart Call allegedly breached
its contract with Genio when Soshan acknowledged Smart Call could not provide
the allegedly agreed-upon goods and services and referred Genio to another
mobile-network provider.  

We recently held that an art dealer crossed a
purposeful-availment “bright line” when he voluntarily traveled to Texas to
conduct business with a Texas resident and allegedly committed a tort in Texas by
making misrepresentations at the meeting.  Max Protetch, Inc. v. Herrin,
340 S.W.3d 878, 887 (Tex. App.—Houston [14th Dist.] 2011, no pet.).  In Protetch,
a Texas resident contracted to purchase a table from a New York-based art
dealer.  Id. at 882.  All negotiations leading to the contract occurred
in New York, and the sale of the table occurred there.  Id.  The Texas
resident assumed responsibility for shipping the table from New York to Texas. 
Id.  After the table arrived damaged, the dealer visited the customer’s
Houston home while in town on other business.  Id.  The dealer allegedly
acknowledged the table was damaged and told the buyer it would be repaired.  Id. 
But after the table was shipped back to New York, the buyer was told it
could not be repaired and his money was never returned.  Id.

We concluded that the meeting in Protetch was
a purposeful contact.  During the meeting, misrepresentations were allegedly
made that formed “a substantial portion of the core of the litigation.”  Id.
at 887.  Although the dealer’s Texas contacts were limited to contracting with
a Texas resident, phone calls discussing the sale of the table, and the one
Texas meeting, we concluded that “the face-to-face meeting in Houston tips the
scales.”  Id.  Our holding was not simply based on the allegation that the
New York dealer committed a tort in Texas.  Rather, we concluded he
“voluntarily came to Texas, and while he was here he purposefully conducted
business with a Texas resident” such that he “crossed a bright line and
purposefully availed [him]self of the privilege of conducting business in
Texas.”  Id. 

Our holding in Horizon Shipbuilding Inc. v. BLyn
II Holding, LLC, 324 S.W.3d 840 (Tex. App.—Houston [14th Dist.] 2010, no
pet.), is also instructive.  In Horizon, an Alabama corporation agreed
to refurbish a yacht owned by a Texas corporation.  Id. at 844.  After a
contract was executed in, and the yacht was shipped to, Alabama,
representatives of the Alabama corporation attended two Texas meetings to
discuss financing and other details surrounding the yacht’s refurbishment.  Id.
at 845.  We concluded the trial court could have properly determined that the
voluntary meetings were substantial and purposeful because there remained for
discussion critical aspects of the refurbishment plans; also, the meetings
constituted a significant part of an ongoing relationship between the parties. 
Id. at 848–49.  

Similarly, it is undisputed that Soshan traveled to
Texas for the sole purpose of meeting with Genio regarding the parties’ business
arrangement.  His voluntary decision to travel to Texas to conduct business can
only be classified as a purposeful act, and not random, fortuitous, or
attenuated.  Moki Mac, 221 S.W.3d at 575.  Furthermore, the trial court
could have found Smart Call sought a benefit, advantage, or profit in Texas in
two ways.  First, the trial court could have found that Smart Call met with
Genio in Texas to discuss performance delays and seek a resolution that would
actualize the parties’ agreement.  Or the trial court could have concluded that
Smart Call simply sought the benefit of informing Genio it could not perform
its obligations under the contract while failing to refund the money Genio had
already paid to Smart Call.  See Protetch, 340 S.W.3d at 887.  

The trial court also could have concluded the Texas
meeting bears a substantial connection to the operative facts of this
litigation.  Genio’s action against Smart Call is a simple breach-of-contract
claim, and it alleges Smart Call breached the contract at the Texas meeting.[8]  See Glencoe
Capital Partners II, L.P. v. Gernsbacher, 269 S.W.3d 157, 167 (Tex. App.—Fort
Worth 2008, no pet.) (“Unlike the misrepresentations in Moki Mac, which
were tangential to the plaintiffs’ core negligence claim, Appellants’ misrepresentations
in this case are the core of Appellees’ claims.”).

For all the reasons above, we conclude Smart Call’s
contacts with Texas were purposeful and sufficient to warrant requiring Smart
Call to defend this suit in Texas.  

C

            Although we have
concluded Smart Call had sufficient minimum contacts with Texas constituting purposeful
availment of this forum, we still must consider whether exercising jurisdiction
over Smart Call would offend traditional notions of fair play and substantial
justice.  See Int’l Shoe, 326 U.S. at 316; BMC Software, 83
S.W.3d at 795.  In that analysis, we consider (1) the burden on Smart Call; (2)
the interest of Texas in adjudicating the dispute; (3) Genio’s interest in
obtaining convenient and effective relief; (4) the interstate judicial system’s
interest in obtaining the most efficient resolution of controversies; and (5)
the shared interest of the several states in furthering fundamental and
substantive social policies.  See Guardian Royal Exch. Assurance, Ltd. v.
English China Clays, P.L.C., 815 S.W.2d 223, 232 (Tex. 1991).    

            Smart Call does
not identify in its brief these factors or directly connect any arguments to
them.  Instead, Smart Call argues only that it should not have to defend this
suit in Texas because “Genio agreed that its deal with Smart Call was subject
to Ohio law” and that any dispute arising from the agreement was to be settled
by mediation or binding arbitration in Ohio.  The existence of the
forum-selection clause in the unsigned service agreement is to be considered in
a purposeful-availment analysis, but it is not dispositive.  See Michiana,
168 S.W.3d at 792 (citing Burger King, 471 U.S. at 482).  Aside from
urging application of the forum-selection clause, Smart Call makes no argument
as to why it is unduly burdensome for it to defend this case in Texas, nor does
it address any other factor in the analysis.  Without more, we have no basis
for concluding it would violate traditional notions of fair play and
substantial justice to confer jurisdiction over Smart Call.  

* * *

            For the foregoing
reasons, we overrule Smart Call’s sole issue.  We therefore affirm the trial
court's order denying Smart Call’s special appearance. 

 

                                                                                    

                                                                        /s/        Jeffrey
V. Brown

                                                                                    Justice

 

 

 

Panel consists of Justices
Anderson, Brown, and Christopher.

 









[1] The service agreement
appears to be a generic template containing blank fields to be filled in with
the mobile-virtual-network operator’s pertinent information.   





[2] Although Flores described
Galvan as only “a friend” who referred Genio to Smart Call, this e-mail
suggests Galvan played a continuing role in negotiations between the two
companies.  





[3] The first invoice, dated
December 8, 2008, includes charges for “Sim Cards,” “New Account setup,” and a
“Sim Profile Setup Fee,” totaling $87,500.  It also reflects “payments/credits”
of $68,750, leaving a balance of $18,750.  The second invoice, dated February
4, 2009, includes charges for 5,000 “Sim Cards” at a cost of $17,500. It
reflects “payments/credits” of $8,700, and so leaves a balance of $8,800.  The
final invoice, dated March 19, 2009, includes a charge for a “One Time Fee for
Cell Control Sim Application” at a cost of $7,000, with no “payments/credits”
and a balance due of $7,000.  





[4] Smart Call does not
identify which e-mail or what language it believes amounts to written
confirmation of the contract.   





[5] In its brief, Smart Call
argues performance is to take place partially in Montana because that is “where
its cell tower is located.”  We cannot find Montana mentioned anywhere else in
the record, including the unsigned service agreement, and it is not clear to us
what connection a cell tower in Montana would have to cell-phone service in
Texas.  





[6] Genio maintains these
contacts are also sufficient to find Smart Call amenable to general
jurisdiction.  Because we conclude Smart Call is amenable to specific
jurisdiction, we do not analyze whether it is also amenable to general
jurisdiction.  





[7] Smart Call makes the
unsupported assertion that the unsigned service agreement calls for the
contract to be performed in Ohio or Montana.  We cannot agree.  The contract
itself is silence as to where it will be performed.  And considering the
agreement between the parties called for Smart Call to deliver SIM cards to
Genio in Texas and provide network access to Texas cell-phone users, the
evidence demonstrates the contract would have been at least partially performed
in Texas.  





[8] Although Hinojosa
complained of “significant performance delays” prior to the Texas meeting,
Genio does not contend Smart Call breached its contract with Genio until Soshan
came to Texas.