Affirmed and Opinion filed December 8, 2009



 



In The

 

Fourteenth Court of
Appeals

                                                                                          



NO. 14-09-00186-CV



 

Citrin Holdings, LLC, Jacob
Citrin, Cargo Investors LLC, and Cargo Investors II LLC, Appellants

V.

Matthew Minnis and Cullen
130, LLC, Appellees

 



On Appeal from the 133rd
District Court

Harris County, Texas

Trial Court Cause No. 2006-78939



 

OPINION

 

Appellants Jacob Citrin, Citrin Holdings LLC, Cargo
Investors LLC, and Cargo Investors II LLC challenge the trial court’s order
denying their special appearances.  See Tex. Civ. Prac. & Rem. Code
Ann. § 51.014(a)(7) (Vernon 2008).  We affirm.  

Background

I.         Parties 

This case involves claims for fraud, fraudulent
inducement, breach of contract, breach of fiduciary duty, and negligent
misrepresentation arising from business relationships among two individuals and
various entities they created to engage in real estate transactions.  There are
two plaintiffs:

·       
Matthew Minnis, a Texas resident.

·       
Cullen 130 LLC, a limited liability company formed
under Delaware law.  See Del. Code Ann. tit. 6, §§ 18-201–18-216 (2009). 
Cullen 130 was formed in October 2004 as a holding company for Minnis, who is
the sole member of Cullen 130.  

Minnis and Cullen 130 sued
five defendants:

·       
Jacob Citrin, a New York resident.

·       
Citrin Holdings LLC, a limited liability company formed
under Delaware law.  See id.  Citrin Holdings was formed on October 6,
2004 as a holding company for Citrin, who is the sole member of Citrin
Holdings.

·       
Cargo Ventures LLC, a limited liability company formed
under New York law.  See N.Y. Ltd. Liab. Co. §§ 201-214 (McKinney 2009). 
Citrin originally created Cargo Ventures in December 2003 and served as its
only member until Citrin and Minnis executed the Cargo Ventures Operating
Agreement in October 2004.  After executing the operating agreement, Citrin
ceased to be a member of Cargo Ventures.  From October 2004 onward, Citrin
Holdings owned 55 percent of Cargo Ventures and Cullen 130 owned 45 percent. 
Citrin and Minnis both signed the operating agreement individually.  Citrin is
the “manager” of Cargo Ventures.

·       
Cargo Investors LLC, a limited liability company formed
under Delaware law.  See Del. Code Ann. tit. 6, §§ 18-201–18-216.  Cargo
Investors was formed in March 2005.  Cargo Investors holds equity interests in
real estate investments in the freight and warehousing markets.  Citrin
Holdings owns 55 percent of Cargo Investors and Cullen 130 owns 45 percent.  Citrin
is the “manager” of Cargo Investors.

·       
Cargo Investors II LLC, a limited liability company
formed under Delaware law.  Id.  Cargo Investors II was formed in
January 2006.  Cargo Investors II holds equity interests in real estate
investments in the freight and warehousing markets.  Citrin Holdings owns 80 percent
of Cargo Investors II and Cullen 130 owns 20 percent.  Citrin is the “manager”
of Cargo Investors II.

II.        Facts

Matthew Minnis and Jacob Citrin met while Citrin
worked for a company that developed and leased warehouse space at airports. 
Minnis was a broker for a tenant who leased warehouse and office space from
Citrin’s company in 2003.

Citrin traveled to Houston, Texas to meet with Minnis
in mid-2003.  Citrin states in an affidavit that the trip’s purpose was to
celebrate signing the lease.  Minnis states in his affidavit that he and Citrin
began discussions during this trip focused on starting a business together to
purchase, develop, and manage real estate.  Citrin states that “it is possible
that Mr. Minnis and I generally and vaguely discussed the possibility of doing
further business together” during the 2003 Houston visit, “but I did not
consider those discussions to be serious . . . .”

Citrin and Minnis continued their dialogue into 2004
through telephone calls and e-mails, and during face-to-face discussions in
Houston.  Citrin traveled to Houston again in mid-2004 to meet with Minnis. 
During this meeting in Houston, Citrin wrote on a piece of paper the following:
“We are partners.  55% Jake, 45% Matt.”  Citrin and Minnis both signed this
document.  Although no copies of this document were made and the original has
disappeared, Citrin and Minnis confirmed the writing’s existence in their affidavits
and depositions.  Minnis asserts the “we are partners” document created a
partnership agreement.  Citrin contends this document is not an enforceable contract.

According to Minnis, Citrin made misrepresentations
to induce him to sign the “we are partners” document.  Minnis alleges that Citrin
promised they would be partners; that the two partners would build a real
estate portfolio together; and that Citrin always would act in Minnis’s best
interest.  Minnis alleges that Citrin made these promises in telephone calls,
faxes, and e-mails directed to Minnis in Texas, and in person while Minnis and
Citrin met in Houston. 

In October 2004, the prolonged discussions between
Citrin and Minnis culminated in a signed contract called the Cargo Ventures
Operating Agreement.  Citrin Holdings and Cullen 130 became the sole members of
Cargo Ventures.  Citrin and Minnis signed the contract in their individual
capacities as well as their representative capacities on behalf of Citrin
Holdings and Cullen 130.  Citrin and Minnis subsequently signed contracts
creating Cargo Investors and Cargo Investors II to hold equity interests in
real estate investments in the freight and warehousing markets.  Citrin, on
behalf of Citrin Holdings, and Minnis, on behalf of Cullen 130, signed the
Cargo Investors Operating Agreement in March 2005; they signed the Cargo
Investors II Operating Agreement in January 2006. 

All three operating agreements obligated Citrin (in
his capacity as “manager”) and Minnis (in his capacity as “the controlling
owner of Cullen 130”) to “devote such time, attention, and effort to the Company
as is reasonably necessary for the management of the Company and the conduct of
its business.”  Minnis and Cullen 130 maintained offices in Houston and
operated out of Houston at all relevant times before and after execution of the
Cargo Ventures Operating Agreement in October 2004.  The operating agreement’s signature
pages listed Houston addresses for Minnis and Cullen 130.  According to Minnis’s
affidavit, “My company, Cullen 130, is based solely in Houston, Texas.  Since
its inception, its only place of business has been Houston, Texas.”

In furtherance of the operating agreements related to
Cargo Ventures, Cargo Investors, and Cargo Investors II, Minnis asserts in his
affidavit that he “actively pursued and developed potential projects, assisted
in bringing potential projects to closing, and participated in the ongoing
management and direction of consummated projects, and fulfilled my management
and decision-making responsibilities for the Cargo Entities based out of Texas.” 
Minnis further states, “From 2004 until late 2006, I conducted business on
behalf of, and provided services to, the three Cargo Entities on a day-to-day
basis from my office in Houston, Texas.”  Citrin and Citrin Holdings operated
out of New York and communicated with Minnis and Cullen 130 in Houston by
telephone, fax, e-mail, and mail.  

Cargo Ventures and Cargo Investors entered several
transactions with Millennium Partners during 2004 and 2005.  Millennium
Partners is partly owned by Citrin’s father-in-law.  In 2005, another entity
approached Cargo Ventures and Cargo Investors with an offer to participate in
future transactions on terms more favorable than those provided by Millennium
Partners.  Citrin and Citrin Holdings wanted to continue transacting with
Millennium Partners but needed Minnis’s consent on behalf of Cullen 130 to do
so.  Negotiations continued for several months and ended with Minnis consenting
on Cullen 130’s behalf to transactions with Millennium Partners. 

Minnis and Cullen 130 allege that Citrin made a
series of misrepresentations to induce them to consent to transactions with
Millennium Partners.  Minnis and Cullen 130 allege that Citrin and Citrin
Holdings promised to (1) grant Cargo Ventures, Cargo Investors, and Cargo
Investors II greater profit interests in future transactions; and (2)
restructure certain existing partnerships and business relationships to
compensate Cargo Ventures, Cargo Investors, and Cargo Investors II for entering
into less favorable agreements with Millennium Partners.  Minnis and Cullen 130
assert that these misrepresentations were made in telephone calls from Citrin
to Minnis and Cullen 130 in Texas.

Citrin, acting through Citrin Holdings, began
proceedings to dissolve Cargo Ventures, Cargo Investors, and Cargo Investors II
in late 2006.  Minnis and Cullen 130 received notice in a fax sent to Houston that
Citrin Holdings had dissolved the three entities.  Minnis and Cullen 130 subsequently
filed this suit against Citrin, Citrin Holdings, Cargo Ventures, Cargo
Investors, and Cargo Investors II on December 13, 2006 alleging six causes of
action: (1) fraud involving alleged misrepresentations relating to the “we are
partners” document and the Millennium Partners transactions; (2) breach of
contract relating to the “we are partners” document and the Cargo Ventures
Operating Agreement; (3) breach of fiduciary duty and good faith; (4) negligent
misrepresentation; (5) an action for an accounting; and (6) an action for
majority oppression.  

Defendants Citrin, Citrin Holdings, Cargo Investors,
and Cargo Investors II challenged the existence of personal jurisdiction in
Texas by filing special appearances under Texas Rule of Civil Procedure 120a. 
The trial court denied the special appearances in an order signed on February
5, 2009.  Defendant Cargo Ventures did not file a special appearance.  Citrin,
Citrin Holdings, Cargo Investors, and Cargo Investors II timely filed a notice
of appeal on February 25, 2009.  See Tex. Civ. Prac. & Rem. Code
Ann. § 51.014(a)(7) (Vernon 2008).  Appellants timely filed a request for
findings of facts and conclusions of law under Texas Rule of Civil Procedure
296; none were filed.

Standard of Review

Determining whether a trial court has personal
jurisdiction over a defendant presents a question of law subject to de novo
review.  BMC Software Belg., N.V. v. Marchand, 83 S.W.3d 789, 794 (Tex.
2002).

Trial courts frequently must resolve fact questions
before deciding the jurisdictional question.  Id.  If the trial court
does not sign findings of fact and conclusions of law, all facts necessary to
support the trial court’s ruling and supported by the evidence are implied in
favor of the trial court’s decision.  Id. at 794-95.  When the appellate
record includes the reporter’s record and the clerk’s record, parties may
challenge the legal and factual sufficiency of these implied findings.  Id.  If
the appellate court determines that the trial court’s findings are supported by
sufficient evidence, or if the material facts are undisputed, then the appellate
court decides as a matter of law whether those facts negate all bases for
personal jurisdiction.  Id.

The plaintiff bears the initial burden of pleading
sufficient allegations to bring a nonresident within the provisions of the
Texas long-arm statute.  Id.; Cerbone v. Farb, 225 S.W.3d 764,
766-67 (Tex. App.—Houston [14th Dist.] 2007, no pet.).  The burden then shifts
to the nonresident defendant to negate all bases of personal jurisdiction
asserted by the plaintiff.  Moki Mac River Expeditions v. Drugg, 221
S.W.3d 569, 574 (Tex. 2007); Cerbone, 225 S.W.3d at 767.

The court will not resolve any merits-based questions
on appeal regarding a special appearance.  Pulmosan Safety Equip. Corp. v.
Lamb, 273 S.W.3d 829, 839 (Tex. App.—Houston [14th Dist.] 2008, pet.
denied).

Governing Law

Texas courts may not exercise personal jurisdiction
over a nonresident defendant unless federal due process requirements and the
Texas long-arm statute are satisfied.  See Helicopteros Nacionales de
Colombia, S.A. v. Hall, 466 U.S. 408, 412-13 (1984); Tex. Civ. Prac. & Rem. Code Ann. § 17.042(1) (Vernon
2008).  The Texas long-arm statute authorizes personal jurisdiction over
a nonresident defendant who “does business” in Texas.[1] 
Tex. Civ. Prac. & Rem. Code Ann. § 17.042; see
also Schlobohm v. Schapiro, 784 S.W.2d 355, 356 (Tex. 1990) (“Our long arm
statute authorizes the exercise of jurisdiction over those who do business in
Texas.”).  The long-arm statute is limited by federal due process
requirements; the broad language of section 17.042’s “does business”
requirement reaches to the full extent authorized by federal due process
requirements.  See Moki Mac, 221 S.W.3d at 575; Marchand,
83 S.W.3d at 795; Guardian Royal Exch. Assurance, Ltd. v. English China
Clays, P.L.C., 815 S.W.2d 223, 226 (Tex. 1991).  Thus, the statute’s requirements
are satisfied if the exercise of personal jurisdiction comports with federal due
process requirements.  See Guardian Royal, 815 S.W.2d at 226.  

Federal due process requirements are satisfied if (1)
the nonresident defendant has “minimum contacts” with Texas; and (2) the
exercise of personal jurisdiction over the nonresident defendant does not
offend “traditional notions of fair play and substantial justice.”  See
Helicopteros, 466 U.S. at 412-13; Moki Mac, 221 S.W.3d at 575. 
Minimum contacts are sufficient when a nonresident defendant “‘purposefully
avails itself of the privilege of conducting activities within the forum state,
thus invoking the benefits and protections of its laws.’”  Moki Mac, 221
S.W.3d at 575 (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)).  

I.         Minimum Contacts

To determine whether a nonresident defendant has
sufficient minimum contacts with Texas to support the exercise of personal
jurisdiction, the court must determine whether the nonresident defendant
“purposefully availed” itself of the privilege of conducting business in
Texas.  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985); Michiana
Easy Livin’ Country, Inc. v. Holten, 168 S.W.3d 777, 784 (Tex. 2005). 
Purposeful availment is the “touchstone of jurisdictional due process.”  Michiana
Easy Livin’ Country, 168 S.W.3d at 784.   

Three key principles govern analysis of purposeful
availment.  Id. at 785.  First, the court considers the defendant’s own
actions; it does not consider the unilateral activity of another party.  Id.
 Second, the court considers whether the defendant’s actions were
purposeful rather than “random, isolated, or fortuitous.”  Id.  Third,
the defendant must seek “some benefit, advantage, or profit by availing itself”
of the privilege of doing business in Texas.  Id.  A defendant may
purposefully avoid Texas by structuring its transactions to neither profit from
Texas’s laws nor subject itself to personal jurisdiction.  Burger King,
471 U.S. at 742; Moki Mac, 221 S.W.3d at 575.  The defendant’s contacts
must be considered as a whole and not in isolation, focusing on the nature and
quality of the contacts.  Guardian Royal, 815 S.W.2d at 230 n.11.  When
there are multiple defendants, the contacts of each defendant must be analyzed
individually.  See Calder v. Jones, 465 U.S. 783, 790 (1984); Shapolsky
v. Brewton, 56 S.W.3d 120, 135 (Tex. App.—Houston [14th Dist.] 2001, pet.
denied), disapproved of on other grounds by Michiana Easy
Livin’ Country, 168 S.W.3d at 788-89.

Minimum contacts analysis is further analyzed in
terms of (1) specific jurisdiction; and (2) general jurisdiction.  

When specific jurisdiction is asserted, the court
focuses on the relationship between the defendant, the forum, and the
litigation.  Helicopteros, 466 U.S. at 414; Moki Mac, 221 S.W.3d
at 575-76.  The cause of action must “arise from or relate to” the nonresident
defendant’s contacts with the forum.  Guardian Royal, 815 S.W.2d at
228.  Specific jurisdiction over a nonresident defendant is established if (1)
the defendant’s activities were purposefully directed to the forum state; and
(2) there is a substantial connection between the defendant’s forum contacts
and the operative facts of the litigation.  Moki Mac, 221 S.W.3d at
585.  

An assertion of general jurisdiction compels a more
demanding minimum contacts analysis and requires a showing of substantial
activities within the forum.  See Guardian Royal, 815 S.W.2d at
228.  The cause of action need not “arise from or relate to” the nonresident
defendant’s contacts with the forum.  See id.  Rather, general
jurisdiction is “dispute blind” and requires contacts of a continuous and
systematic nature.  See Helicopteros, 466 U.S. at 414-16; Guardian
Royal, 815 S.W.2d at 228.   Thus, it is more difficult to establish general
jurisdiction.  See Helicopteros, 466 U.S. at 414-16; Guardian
Royal, 815 S.W.2d at 228.  To determine whether a nonresident defendant had
continuous and systematic contacts with Texas sufficient to support general
jurisdiction, the court examines the defendant’s contacts and forum-related
activities up to the time suit was filed.  PHC-Minden, L.P. v.
Kimberly-Clark Corp., 235 S.W.3d 163, 170 (Tex. 2007). 

The defendant must negate all bases for personal
jurisdiction to prevail in a special appearance.  See Shapolsky, 56
S.W.3d at 135.  A single basis for personal jurisdiction is sufficient to
confer jurisdiction over a defendant.  See id.  The court need not
address general jurisdiction if it finds that a defendant is subject to
specific jurisdiction.  See id.   If the court finds specific
jurisdiction over a defendant based on one cause of action, the court need not
address jurisdiction as to any other causes of action.  See id.  

II.        Fair Play and Substantial Justice

Once the court concludes that the defendant has
sufficient minimum contacts with the state to establish personal jurisdiction, the
defendant bears the burden of establishing that the exercise of personal
jurisdiction would offend traditional notions of fair play and substantial
justice.  Conner v. ContiCarriers & Terminals, Inc., 944 S.W.2d 405,
411 (Tex. App.—Houston [14th Dist.] 1997, no writ).  

To determine whether the exercise of personal
jurisdiction offends traditional notions of fair play and substantial justice,
the court considers (1) the burden on the defendant; (2) the interests in the
forum state in adjudicating the dispute; (3) the plaintiff’s interests in
obtaining convenient and effective relief; (4) the interstate judicial system’s
interest in obtaining the most efficient resolution of controversies; and (5)
the shared interest of the states in furthering fundamental substantive social
policies.  Burger King, 471 U.S. at 476-77; Guardian Royal, 815
S.W.2d at 228.  Only in rare cases will the exercise of personal jurisdiction
not comport with fair play and substantial justice when a nonresident defendant
has purposefully availed itself of the privilege of conducting business within
a forum.  Guardian Royal, 815 S.W.2d at 231. 

Analysis

Appellants Citrin, Citrin Holdings, Cargo Investors,
and Cargo Investors II contend the trial court erred in denying their
respective special appearances.  We address each appellant in turn.

I.         Jacob Citrin

            Minnis and Cullen
130 assert that personal jurisdiction over Citrin is established because they
effected personal service on him, and because the minimum contacts standard is satisfied. 
Minnis and Cullen 130 contend Citrin is subject to specific jurisdiction based
on (1) the existence of long-term contractual relationships with Minnis and
Cullen 130; and (2) misrepresentations Citrin allegedly made to Minnis and
Cullen 130.  Minnis and Cullen 130 do not contend that Citrin is subject to
general jurisdiction in Texas.  

            A.        Personal
Service 

            Citrin filed his
special appearance on April 13, 2007.  On January 16, 2009, the trial court
signed an order compelling Citrin to appear for deposition by January 23,
2009.  The trial court limited the scope of the deposition to “any pending or
potential transactions, and any efforts associated therewith, by any Defendant
or affiliated person or entity, that would in any way affect, transfer,
diminish, or dilute the assets made subject to Plaintiffs’ claims.”

Minnis and Cullen 130 effected personal service on
Citrin after his deposition was concluded on January 23, 2009.  Relying on Oates
v. Blackburn, 430 S.W.2d 400, 402-03 (Tex. App.—Houston [14th Dist.] 1968,
writ ref’d n.r.e.), they contend that personal service of process on Citrin in
Texas is sufficient to establish personal jurisdiction in Texas.

We reject Minnis’s and Cullen 130’s contention in
light of the parties’ course of conduct.  It is undisputed that Citrin, Citrin
Holdings, Cargo Investors, and Cargo Investors II timely filed special
appearances.  “The issuance of process for witnesses, the taking of
depositions, the serving of requests for admissions, and the use of discovery processes,
shall not constitute a waiver of such special appearance.”  Tex. R. Civ. P.
120a.  “Every appearance, prior to judgment, not in compliance with this rule
is a general appearance.”  Id.  The “privilege against process is
effective for a defendant who enters the state solely to contest jurisdiction
under Rule 120a on any matter connected with the contested action.”  Oates,
430 S.W.2d at 403.  Consistent with Rule 120a, counsel for Minnis and Cullen
130 stated during a January 13, 2009 hearing that “[w]e’ve been operating under
the impression and with the agreement that depositions are subject to the
special appearance  . . . .”

In light of the parties’ agreement — acknowledged on
the record by counsel for Minnis and Cullen 130 — we conclude that Citrin is
not subject to personal jurisdiction in this matter based on personal service
effected upon him following his deposition.[2]

            B.        Minimum
Contacts

We next consider whether Citrin purposefully availed
himself of the privilege of doing business in Texas.  The circumstances relating
to Citrin individually involve analysis of contacts relating to contract and
tort claims.

Standing alone, entering a contract with a Texas
resident does not necessarily establish minimum contacts sufficient to support
personal jurisdiction.  Burger King, 471 U.S. at 478-79; Nogle &
Black Aviation, Inc. v. Faveretto, 290 S.W.3d 277, 283 (Tex. App.—Houston
[14th Dist.] 2009, no pet.); Ashdon, Inc. v. Gary Brown & Assocs.,
260 S.W.3d 101, 113 (Tex. App.—Houston [1st Dist.] 2008, no pet.); Olympia
Capital Assocs., L.P. v. Jackson, 247 S.W.3d 399, 417 (Tex. App.—Dallas
2008, no pet.).  But a single contract may establish sufficient minimum
contacts when considered against a backdrop of “prior negotiations and
contemplated future consequences, along with the terms of the contract and the
parties’ actual course of dealing[.]”  Burger King, 471 U.S. at 478-79; see
also Fish v. Tandy Corp., 948 S.W.2d 886, 890 (Tex. App.—Fort Worth
1997, pet. denied) (nonresident defendant established purposeful availment by
negotiating with Texas corporation through personal visits to Texas and through
telephone, mail, and faxes to and from Texas).  

The contract’s place of performance is an important consideration. 
See Barnstone v. Congregation Am Echad, 574 F.2d 286, 288-89 (5th Cir.
1978); Fleischer v. Coffey, 270 S.W.3d 334, 338 (Tex. App.—Dallas 2008,
no pet.).  The Texas long-arm statute specifically references place of
performance.  See Tex. Civ. Prac. & Rem. Code Ann. § 17.042(1)
(“[A] nonresident defendant does business in this state if the nonresident . .
. contracts by mail or otherwise with a Texas resident and either party is to
perform the contract in whole or in part in this state.”).  Generally, a party
is not subject to jurisdiction in Texas if a contract calls for performance out
of state.  See Am. Type Culture Collection, Inc. v. Coleman, 83 S.W.3d
801, 807-08 (Tex. 2002); Ashdon, Inc., 260 S.W.3d at 113; Jackson,
247 S.W.3d at 417-18.  A contract calling for performance in Texas can support
personal jurisdiction in appropriate circumstances.  See Fleischer, 270
S.W.3d at 338; Nogle & Black Aviation, Inc., 290 S.W.3d at 283.  It
is reasonable to subject a nonresident defendant to personal jurisdiction in
Texas in connection with litigation arising from a contract specifically designed
to benefit from the skills of a Texas resident who performs contractual
obligations in Texas.  See Nogle & Black Aviation, Inc., 290 S.W.3d
at 283.

As noted above, Minnis and Cullen 130 also have
asserted tort claims.  They contend that a defendant subjects himself to
personal jurisdiction in Texas by directing a tort toward Texas.  The Texas
Supreme Court addressed this approach to personal jurisdiction in Michiana
Easy Livin’ Country, 168 S.W.3d at 790-92.  Michiana Easy Livin’ Country
teaches that courts should focus their jurisdictional analysis on the defendant’s
actual contacts rather than attempting to discern whether a given set of
circumstances amounts to “directing” a tort towards Texas.  See id. at
791.  Because minimum contacts analysis addresses the actions and reasonable
expectations of the nonresident defendant, this court will weigh Citrin’s
alleged conduct in terms of its significance as evidence of contacts between
Citrin and Texas.  See id.

Specific jurisdiction is not necessarily established
by evidence that a nonresident defendant made misrepresentations in a single
telephone call to a Texas resident.  Id. at 791-92.  But fraudulent
misrepresentations made over a series of contacts to induce a party to enter a
transaction can support personal jurisdiction.  See Glencoe Capital Partners
II, L.P. v. Gernsbacher, 269 S.W.3d 157, 164-67 (Tex. App.—Fort Worth 2008,
no pet.) (defendants were subject to personal jurisdiction in Texas based on misrepresentations
during numerous telephonic board meetings over multiple years that induced Texas-based
board members, who called into the meetings from Texas using a toll-free
number, to enter certain transactions).

Citrin contends that he did not purposefully avail
himself of the privilege of doing business in Texas because the Cargo Ventures
Operating Agreement contained a choice of law clause selecting New York law.  A
choice of law clause selecting the laws of a different forum weighs against
finding a defendant subject to personal jurisdiction in Texas.  See Michiana
Easy Livin’ Country, 168 S.W.3d at 792.  Choice of law clauses “should not
be ignored in considering whether a defendant has ‘purposefully invoked the
benefits and protections of a State’s laws.’”  Id. (quoting Burger
King, 471 U.S. at 482).  But neither are they dispositive.  See
Electrosource, Inc. v. Horizon Battery Techs., Ltd., 176 F.3d 867, 873 (5th
Cir. 1999).  A choice of law clause is merely one factor to consider in
determining whether a forum state has personal jurisdiction over a nonresident
defendant.  Id.  The “we are partners” document did not contain a choice
of law clause.  

Citrin states in his affidavit that “[s]ince December
3, 2003, I have traveled to Texas approximately seven or eight times as a
representative of Cargo Ventures, and during three or four of those trips, I
visited the offices of Matthew Minnis . . . the sole member of Delaware limited
liability company Cullen 130, LLC . . . .”  Citrin nonetheless argues that he
structured his contractual relationship with Minnis to avoid subjecting himself
to personal jurisdiction in Texas.  A defendant can avoid a forum by
structuring his transactions so that he does not profit from the forum’s laws and
does not subject himself to its jurisdiction.  Burger King, 471 U.S. at
472; Moki Mac, 221 S.W.3d at 575; Michiana Easy Livin’ Country,
168 S.W.3d at 785.  Citrin further contends that the “we are partners” document
is not enforceable, and that the asserted misrepresentations are not actionable
because they are at most vague statements regarding potential future activities.

Weighing the parties’ arguments in light of the
considerations discussed above, we conclude that Minnis and Cullen 130 have
established specific jurisdiction as to Citrin individually on this record.

Citrin contracted with Minnis, a Texas resident, in
contemplation of an ongoing business relationship to be performed at least in
part in Texas.  Citrin conducted prolonged discussions with Minnis before signing
the “we are partners” document and the Cargo Ventures Operating Agreement.  In
the course of these discussions, Citrin traveled to Houston in mid-2003 to meet
with Minnis; communicated face-to-face with Minnis in Texas and via telephone,
fax, e-mail, and mail; traveled to Houston again in mid-2004 to meet with
Minnis; drafted and signed the disputed “we are partners” document in Houston;
and signed the Cargo Ventures Operating Agreement individually.  Minnis and
Cullen 130 allege that Citrin sought to obtain the benefits of Minnis’s
contacts and efforts without compensating Minnis.

These circumstances differ significantly from Michiana
Easy Livin’ Country, in which the transaction at issue originated in a
single outbound telephone call from a vehicle-seeking Texas resident to an
out-of-state dealer.  Here, in contrast, the circumstances involve multiple
Texas contacts over many months in the course of an ongoing relationship that “was
not unilaterally initiated by the Texas resident.”  See Nogle & Black
Aviation, Inc., 290 S.W.3d at 283; cf. Michiana Easy Livin’ Country,
168 S.W.3d at 784.  These circumstances demonstrate Citrin’s purposeful contact
with Texas along with an intent to obtain benefits from those contacts, and
they defeat any suggestion that Citrin’s business-related presence in Texas was
merely “random, isolated, or fortuitous.”  Michiana Easy Livin’ Country,
168 S.W.3d at 785; see also GJP, Inc. v. Ghosh, 251 S.W.3d 854, 879
(Tex. App.—Austin 2008, no pet.) (“We cannot agree . . . that [the defendant’s]
physical presence in Texas when closing the sale is ‘fortuitous’ rather than
‘purposeful’ in the sense the United States and Texas supreme courts have
employed those concepts.”); cf. Info. Servs. Group, Inc. v. Rawlinson,
No. 14-09-00242-CV, 2009 WL 3643515, at *6 (Tex. App.—Houston [14th Dist.] Nov.
5, 2009, no pet. h.) (“. . . Rawlinson did not elect to visit Texas; it is
undisputed that he attended the conferences at [the plaintiff’s] direction.”).

These multiple contacts culminated in the Cargo
Ventures Operating Agreement, which obligated Minnis and Citrin to “devote such
time, attention, and effort to the Company as is reasonably necessary for the
management of the Company and the conduct of its business.”  Minnis performed
his obligations under the Cargo Ventures Operating Agreement in Texas.  In his
affidavit, Minnis states that he actively pursued and developed potential
projects, assisted in bringing potential projects to closing, and participated
in ongoing management and decision-making responsibilities from his office in
Texas.  These facts demonstrate that the parties’ contractual dispute has a “‘substantial
connection’” with Texas.  See Burger King, 471 U.S. at 479 (original
emphasis) (quoting McGee v. Int’l Life Ins. Co., 355 U.S. 220, 223
(1957)).

In light of this evidence, the presence of a New York
choice of law provision in the Cargo Ventures Operating Agreement is not
dispositive and is outweighed by the other Texas-centered contacts discussed
above.  The evidence of Texas-based contractual performance in this case reinforces
the exercise of specific jurisdiction.  See Tex. Civ. Prac. & Rem.
Code Ann. § 17.042(1); Nogle & Black Aviation, Inc., 290 S.W.3d at
283 (upholding exercise of personal jurisdiction in Texas over nonresident based
on contract designed to benefit from the skills of a Texas resident who
performed the contract in Texas); Fleischer, 270 S.W.3d at 338 (contract
calling for performance in Texas supported jurisdiction in Texas).  

Citrin also is alleged to have made misrepresentations
that induced Minnis to sign the “we are partners” document in Houston; these
misrepresentations are alleged to have been made face-to-face to Minnis in
Houston, and via faxes, e-mails, and mail sent to Minnis in Houston.  Citrin
made additional alleged misrepresentations during multiple telephone calls to
Minnis in Texas to obtain Minnis’s consent, on behalf of Cullen 130, to pursue transactions
with Millennium Partners.  These multiple, significant contacts provide
additional support for the exercise of personal jurisdiction over Citrin individually
in Texas.  See Gernsbacher, 269 S.W.3d at 165 (series of fraudulent
misrepresentations made to Texas resident to induce participation in transaction
supported jurisdiction); Fish, 948 S.W.2d at 890 (pre-contract
negotiations consisting of personal trips to Texas, telephone calls, mail, and
faxes to and from Texas supported jurisdiction).  When Citrin responds by
arguing that the alleged misrepresentations are too vague or otherwise not actionable,
and that the “we are partners” document is not enforceable, he invites us to
resolve the merits of Minnis’s and Cullen 130’s claims against him.  Abundant
case law teaches that we should not reach the merits of the parties’ dispute in
the course of addressing personal jurisdiction, and we decline to do so here.  See,
e.g., Pulmosan Safety Equip. Corp., 273 S.W.3d at 839.

This record supports the trial court’s exercise of
specific jurisdiction over Citrin individually and establishes a substantial
connection between Citrin’s Texas contacts and the operative facts of the
litigation.

II.        Citrin Holdings
LLC

We now turn to personal jurisdiction over Citrin
Holdings, a Delaware limited liability company owned solely by Citrin with its
principal place of business in New York.  Citrin Holdings was the majority
owner of Cargo Ventures, Cargo Investors, and Cargo Investors II.  Cullen 130
was the minority owner of these entities.

A threshold question arises regarding the universe of
contacts that should be considered as to Citrin Holdings.  Because it was
formed in October 2004, Citrin Holdings contends that Texas contacts arising from
Citrin’s individual activities before that time are not germane to deciding whether
it is subject to personal jurisdiction.  Minnis and Cullen 130 contend that
pre-October 2004 contacts can be considered because Citrin testified that he had
planned to create Citrin Holdings while he was negotiating with Minnis.  We
base our analysis below as to Citrin Holdings on contacts arising when Citrin
Holdings was created in October 2004 and thereafter.  Regardless of Citrin’s individual
intent before October 2004 to create Citrin Holdings at some later date, we
cannot attribute to Citrin Holdings a purpose to do business in Texas based
upon contacts arising before this entity existed and before it conceivably
could have done any business anywhere.  See Michiana Easy Livin’ Country,
168 S.W.3d at 784-85 (purposeful availment must consider the defendant’s own
actions).

To support the exercise of personal jurisdiction,
Minnis and Cullen 130 rely heavily on Citrin Holdings’ execution of the Cargo
Ventures Operating Agreement in October 2004, the Cargo Investors Operating
Agreement in March 2005, and the Cargo Investors II Operating Agreement in
January 2006.  Citrin Holdings and Cullen 130 constitute the entire membership
of each entity.  On this record, Cullen 130 performed its obligations and
activities under each operating agreement in Texas.  Minnis and Cullen 130
assert that Citrin Holdings regularly communicated with them in Houston and
sent a series of notices to Houston in furtherance of the operating agreements
governing Cargo Ventures, Cargo Investors, and Cargo Investors II.  Citrin
Holdings made alleged misrepresentations to induce Minnis and Cullen 130 into
authorizing transactions with Millennium Partners.  Minnis and Cullen 130
allege these misrepresentations were made in a series of communications to
Minnis and Cullen 130 in Texas.  

For its part, Citrin Holdings stresses that each of
the operating agreements contains a choice of law clause selecting New York law
(as to Cargo Ventures) or Delaware law (as to Cargo Investors and Cargo
Investors II).  Citrin Holdings also relies heavily on TeleVentures, Inc. v.
Int’l Game Tech., 12 S.W.3d 900 (Tex. App.—Austin 2000, no pet.), in
arguing that it did not purposefully avail itself of the privilege of doing
business in Texas.

The dispute in TeleVentures arose after IGT, a
Nevada corporation with its principal place of business in Nevada, signed two
letters of intent in late 1995 with Televentures, a Texas corporation with its
principal place of business in Texas.  Id. at 904.  The letters addressed
the companies’ joint efforts to develop devices that would allow guests to play
casino-style games on their hotel televisions.  Id.  Under these
letters, the parties stated their intent to sign a formal agreement if
preliminary tests of the in-room hotel gaming system were satisfactory.  Id.
at 904-05.  IGT and TeleVentures communicated via personal visits, faxes,
letters, and telephone calls for more than a year thereafter.  Id. at
905.  TeleVentures’s employees traveled to Nevada, but no IGT employees or
representatives came to Texas.  Id.  The parties never signed a formal
agreement; instead, IGT sent a letter to TeleVentures in Texas in January 1997 terminating
all relations between the two companies.  Id.  The termination letter prompted
TeleVentures to sue IGT for breach of contract, breach of fiduciary duty, fraud
in the inducement, fraud, negligent misrepresentation, and tortious
interference.  Id.

The appellate court concluded that neither the letters
of intent nor communications directed to TeleVentures in Texas provided a
sufficient basis for specific jurisdiction over IGT in Texas.  Id. at
909.  In so holding, the court stressed that TeleVentures’s role in the project
evaporated after IGT chose a technological configuration that effectively
excluded TeleVentures from further participation.  Id.  TeleVentures nonetheless
continued to develop marketing tools and a device called the “game cube” that
IGT never used, but these unilateral activities by TeleVentures were
insufficient to establish purposeful availment by IGT.  Id.  “Although
IGT had knowledge of the game cube, IGT neither required nor requested it.”  Id. 
The court also noted that the second letter of intent contemplated the creation
of a partnership between IGT and TeleVentures calling for performance in
Nevada, and that TeleVentures changed its state of incorporation from Texas to
Nevada during its relationship with IGT.  Id. at 905, 910.  The court
concluded that “[t]he terms of the letters of intent and the history of the
parties’ negotiations do not reveal purposeful conduct by IGT sufficient to
subject it to the jurisdiction of the Texas district court.”  Id. at
910.

The circumstances here involving Citrin Holdings are
distinguishable from those at issue in TeleVentures, in which the Texas
corporation’s role diminished over time and the center of gravity of the
parties’ relationship shifted towards Nevada.  Unlike TeleVentures,
negotiations here ripened into three formal contracts — including the Cargo
Ventures Operating Agreement — to which Citrin Holdings was a party.

In contrast to TeleVentures¸ in which the
parties’ activities migrated away from Texas, the activities at issue here
maintained a consistent Texas connection and focus sufficient to establish a
purpose by Citrin Holdings to do business in Texas.  Citrin Holdings contracted
to create Cargo Ventures, which conducted day-to-day business from 2004 until
late 2006 through Minnis as a Houston-based Cargo Ventures employee.  The
process leading to the Cargo Ventures Operating Agreement was not unilaterally
initiated or pursued by Minnis or Cullen 130.  Additionally, Cargo Ventures does
not challenge the exercise of personal jurisdiction over it by a Texas court.  This
latter fact underscores that contractual performance occurred in Texas, and diminishes
the importance of the New York choice of law provision contained in the Cargo
Ventures Operating Agreement.

The circumstances here more closely parallel those
described in Nogle & Black Aviation.  “The doctrine of purposeful
availment recognizes that a defendant can make choices to avoid benefitting
from activities in Texas.”  Nogle & Black Aviation, Inc., 290 S.W.3d
at 283 (citing Moki Mac, 221 S.W.3d at 575, and Michiana Easy Livin’
Country, 168 S.W.3d at 785).  “Even though N & B may have made some
such choices, such as not locating any employees or offices in Texas and not
targeting the Texas market, it specifically chose to use the work of this Texas
resident.”  Nogle & Black Aviation, Inc., 290 S.W.3d at 283.  “That
work was performed in Texas . . . .”  Id.  These circumstances mean it
is “not unreasonable” to expect litigation in Texas arising in connection with
the performance of a contract in Texas by an entity with whom Citrin Holdings purposefully
chose to contract.  See id.; see also Retamco Operating, Inc. v.
Republic Drilling Co., 278 S.W.3d 333, 340 (Tex. 2009) (“[W]e have found
that, even in instances where a contract was signed in another state, an
out-of-state company with no physical ties to Texas still has minimum contacts
with Texas when it is clear the company purposefully directed its activities
towards Texas.”).  Accordingly, the district court properly concluded on this
record that specific jurisdiction exists as to Citrin Holdings.

III.      Cargo Investors LLC
and Cargo Investors II LLC

Minnis and Cullen 130 contend that Cargo Investors
and Cargo Investors II are subject to general and specific jurisdiction because
(1) Cullen 130, a member of both Cargo Investors and Cargo Investors II,
maintains an office in and operates out of Texas; and (2) Minnis and Cullen 130
performed work on behalf of Cargo Investors and Cargo Investors II in Texas. 
Appellants contend that the record does not support a finding that Minnis or
Cullen 130 conducted work on behalf of Cargo Investors or Cargo Investors II
from Texas.

In support of their special appearances, Cargo
Investors and Cargo Investors II submitted an affidavit signed by Jacob
Citrin.  Among other things, Citrin averred that these two entities 

·       
“simply hold equity interests in certain investments, but do not
offer or provide real estate development or property management services;”

·       
have no employees; and

·       
have never been organized under Texas law, never maintained an
office or other place of business in Texas, do not conduct any business in
Texas, have never owned or leased property in Texas, and do not maintain bank
accounts in Texas.

Citrin further stated that
“Minnis was never an employee of Cargo Investors I or Cargo Investors II, and
to my knowledge as the manager of both entities, neither Minnis nor Cullen 130
conducted business on behalf of Cargo Investors I or Cargo Investors II.”  Citrin
echoed these assertions in his deposition testimony.

Minnis filed an affidavit in response to the special
appearances in which he referred to Cargo Ventures, Cargo Investors and Cargo
Investors II collectively as the “Cargo Entities.”  Minnis averred that

·       
he has lived in Houston his entire life;

·       
his primary residence is in Houston;

·       
Cullen 130 is based solely in Houston, where it has been based
since its inception;

·       
“From 2004 until late 2006, I conducted business on behalf of,
and provided services to, the three Cargo Entities on a day-to-day basis from
my office in Houston, Texas;” and

·       
“I actively pursued and developed potential projects, assisted in
bringing potential projects to closing, participated in the ongoing management
and direction of consummated projects, and fulfilled my management and
decision-making responsibilities for the Cargo Entities based out of Texas.”

Cargo Investors and Cargo Investors II thereafter
filed a supplemental affidavit signed by Jacob Citrin, in which he disputed the
accuracy of Minnis’s statement that Minnis conducted business on behalf of all
three Cargo Entities on a day-to-day basis in Texas.  Citrin asserted that
“[t]he vast majority, if not all, of Mr. Minnis’ work for our business together
was on behalf of Defendant Cargo Ventures.”  Citrin added, “Although Mr. Minnis
was given the title of President of Cargo Investors I, he did not actually do
anything meaningful as a result of having that title.  With regard to Cargo
Investors II, he was not even conferred with any title, and performed no work
for that holding company.”  Citrin also signed a second supplemental affidavit
in which he disputed the accuracy of Minnis’s assertion “that he performed work
to identify and develop properties to be owned by Cargo Investors I and Cargo
Investors II.”  Cargo Investors and Cargo Investors II also point to an excerpt
from Minnis’s deposition in which Minnis agreed with the assertion that “all of
the for-a-fee development work that you and Jake [Citrin] did together [was]
done through Cargo Ventures . . . .”  

The record here demonstrates that a fact dispute
exists regarding the extent to which Minnis’s and Cullen 130’s Texas activities
were performed on behalf of Cargo Investors and Cargo Investors II.  As noted
earlier, the district court did not file findings of fact; therefore, all facts
necessary to support the trial court’s ruling and supported by the evidence are
implied in favor of the trial court’s decision.  Marchand, 83 S.W.3d at
794-95.  We conclude that the evidence here is legally and factually sufficient
to support the district court’s implied finding that Minnis and Cullen 130
acted on behalf of Cargo Investors and Cargo Investors II when they performed
activities in Texas.  The activities Minnis and Cullen 130 performed in Texas
suffice to establish specific jurisdiction in Texas as to Cargo Investors and
Cargo Investors II because these activities (1) are attributable to these
appellants; (2) are not random, isolated, or fortuitous; and (3) were designed
to confer a benefit, advantage or profit.  See Michiana Easy Livin’ Country,
168 S.W.3d at 785.  Furthermore, the claims at issue in this litigation arise from
and relate to these contacts with Texas.  Guardian Royal, 815 S.W.2d at
228.  These contacts suffice to establish specific jurisdiction as to Cargo
Investors and Cargo Investors II.[3]

C.        Fair Play and Substantial Justice

Having concluded that the Texas contacts of Citrin,
Citrin Holdings, Cargo Investors, and Cargo Investors II demonstrate purposeful
availment and are substantially connected to the operative facts of the
litigation, we next must determine whether exercising personal jurisdiction
over appellants offends traditional notions of fair play and substantial
justice.

To answer this question, the court considers (1) the
burden on the defendant; (2) the interests in the forum state in adjudicating
the dispute; (3) the plaintiff’s interests in obtaining convenient and
effective relief; (4) the interstate judicial system’s interest in obtaining
the most efficient resolution of controversies; and (5) the shared interest of
the states in furthering fundamental substantive social policies.  Burger
King, 471 U.S. at 476-77.  Only in rare cases will the exercise of personal
jurisdiction offend traditional notions of fair play and substantial justice.  Retamco
Operating, Inc., 278 S.W.3d at 341-42.  The defendant bears the burden of
establishing that the exercise of personal jurisdiction would offend
traditional notions of fair play and substantial justice.  Conner, 944
S.W.2d at 411.  

After considering all of the factors, we conclude
that the exercise of personal jurisdiction in this case is consistent with
traditional notions of fair play and substantial justice.  Appellants contend that
defending this suit in Texas would be a “considerable burden” because (1)
Citrin is a New York resident, and (2) Citrin Holdings, Cargo Investors, and
Cargo Investors II are based in New York.  Appellants may well incur greater
expenses defending this suit in Texas compared to New York, but that is true
for any nonresident defendant.  See id.  Distance to travel is generally
not a significant consideration due to modern transportation.  See Gernsbacher,
269 S.W.3d at 168.  Further, Citrin traveled to Texas to personally meet with
Minnis on two separate occasions prior to signing the “we are partners”
document and Cargo Ventures Operating Agreement.  Also, defendant Cargo
Ventures submitted to jurisdiction in Texas.  Requiring Minnis and Cullen 130
to litigate their claims against the defendants in separate jurisdictions would
be (1) inefficient; (2) burdensome on Minnis and Cullen 130; and (3) a waste of
judicial resources.  See Kelly v. Gen. Interior Constr., Inc., 262
S.W.3d 79, 86 (Tex. App.—Houston [14th Dist.] 2008, pet. granted).  

After weighing all of the relevant factors, we
conclude that exercising personal jurisdiction over appellants would not offend
traditional notions of fair play and substantial justice.   

 

 

 

 

 

Conclusion

            We reject the
issues raised on appeal and affirm the trial court’s order denying the special
appearances of Citrin, Citrin Holdings, Cargo Investors, and Cargo Investors
II.

 

                                                                                    

                                                                        /s/        William
J. Boyce

                                                                                    Justice

 

 

 

Panel consists of Justices Anderson and Boyce.  Former
Justice Guzman not participating.









[1] 
The Texas long-arm statute provides as follows:

In addition to
other acts that may constitute doing business, a nonresident does business in
this state if the nonresident:

(1)
contracts by mail or otherwise with a Texas resident and either party is to
perform the contract in whole or in part in this state; 

(2)
commits a tort in whole or in part in this state; or 

(3) recruits Texas residents, directly or through
an intermediary located in this state, for employment inside or outside this
state. 

 

Tex. Civ. Prac. & Rem. Code
Ann. § 17.042(1)-(3).





[2] 
Minnis and Cullen 130 contend that personal service on Citrin also established
personal jurisdiction as to Citrin Holdings, Cargo Investors, and Cargo
Investors II because Citrin was the sole owner of Citrin Holdings and the
“manager” of the latter two entities.  Given our holding that personal service
upon Citrin in Texas did not establish personal jurisdiction in light of the
parties’ agreement, we do not address whether personal service effected upon
Citrin would have been sufficient to establish personal jurisdiction in Texas
as to these separate entities.





[3] 
For diversity purposes in federal court, the citizenship of a limited liability
company’s members is attributed to the LLC itself.  See, e.g., Harvey v.
Grey Wolf Drilling Co., 542 F.3d 1077, 1080 (5th Cir. 2008) (“[L]ike
limited partnerships and other unincorporated associations or entities, the
citizenship of a LLC is determined by the citizenship of all of its members.”)
(citations omitted).  However, personal jurisdiction is a separate inquiry.  Cf. 
Goforit Entm’t LLC v. Digimedia.com L.P., 513 F. Supp. 2d 1325, 1331
(M.D. Fla. 2007) (Rule for measuring citizenship in diversity cases does not
mean that a limited partnership necessarily is subject to personal jurisdiction
in every state of which its partners are citizens; “A limited partnership does
not necessarily derive any benefit from the forum merely by virtue of having a
limited partner there, nor does it necessarily do business there.”).  The
personal jurisdiction determination in this case does not depend upon
attributing Texas citizenship to LLCs.  Instead, it rests upon a sufficiently
supported implied finding that the Texas-based activities of Minnis and Cullen
130 also are the Texas-based activities of Cargo Investors and Cargo Investors
II.  In light of this conclusion, we do not reach the parties’ remaining
contentions regarding specific jurisdiction as to Cargo Investors and Cargo
Investors II.  We also do not address general jurisdiction.  See Shapolsky,
56 S.W.3d at 135.